**NORWALK CORE et al.**

v.

**NORWALK REDEVELOPMENT AGENCY et al.**

**Civ. No. 12017.**

United States District Court
D. Connecticut.

Nov. 8, 1968.

See also 2 Cir., 395 F.2d 920.

Stephen L. Fine, Westport, Conn., Jonathan Lubell, New York City, for plaintiffs.

Robert A. Slavitt, Norwalk, Conn., for defendants.

RULING ON APPLICATION OF FRANK AND ETHEL WILLIAMS FOR A PRELIMINARY INJUNCTION

BLUMENFELD, District Judge.

In June of 1963 the City of Norwalk, Connecticut, commenced an urban renewal project. (The planning for this project started in 1958, but the Loan and Capital Grant Contract between the Norwalk Redevelopment Agency (Agency) and the Housing and Home Finance Agency (HHFA, now HUD) was not signed until June 1963). In January and February of 1964 David Katz & Sons, a local developer and apartment management firm, entered into negotiation with the Agency to become Preferred Sponsor of the project. Although there is a lack of evidence as to whether any sponsorship agreement between the Agency and Katz was ever signed or formally approved by HHFA, the Agency in June 1965 sold property in the project area to Katz & Sons for private development, and all parties recognize Katz & Sons as the Preferred Sponsor.

Prior to February 1966 the plaintiffs, Frank and Ethel Williams, were tenants in the project area, at a rent of approximately $72 a month. In May 1965 the Williamses were notified that the building they were living in was to be razed in the course of the redevelopment, and that they would have to move out. The Williamses applied for an apartment in a city project for low income families, but the application was denied on the basis that the Williams' family income exceeded the amount set by the standards for admission. Thereupon, the relocation office of the Agency directed the Williamses to Katz, who rented them an apartment in Carlton Court, an apartment house complex partially owned by defendant, Robert Katz, and managed by defendant, David Katz & Sons. The

apartment was rented to the Williamses at a "reduced rate"[1] of $130 a month. The Williamses moved from the project area to Carlton Court in February 1966.

In June 1967 this suit was brought in the United States District Court for the District of Connecticut by the Norwalk Chapter of CORE and several classes of individual plaintiffs against the Agency, the Norwalk Housing Authority, HUD, and the Preferred Sponsors. The gravamen of the complaint was that in effecting the redevelopment and relocating displaced families, the agencies and the sponsors had discriminated against non-whites, had entered into an intentional course of conduct to drive non-whites from the Norwalk area, and had failed to provide proper relocation assistance as mandated by Section 105(c) of the Housing Acts of 1949 and 1954, 42 U.S.C. § 1455(c).[2] In July 1967 the District Court dismissed the complaint on the basis that (1) the plaintiffs did not have standing to assert their claims; and (2) the suit failed to constitute a proper class action under Fed.R.Civ.P. 23. Norwalk Core v. Norwalk Redevelopment Agency, 42 F.R.D. 617 (D.Conn.1967). In June 1968 the United States Court of Appeals for the Second Circuit reversed the District Court, holding that the plaintiffs had standing to assert all three claims, and as to the classes composed of the individual plaintiffs, the suit constituted a proper class action. Norwalk Core v. Norwalk Redevelopment Agency, 395 F.2d 920 (2d Cir. 1968). The Williamses claim to fall within the class of individual plaintiffs "whose homes located in the Project Area have been demolished by the acts of defendants * * * and who now occupy rental units without the Project Area and within the City of Norwalk, at excess rentals."[3]

1. The lease states that the apartment is rented at a "reduced rate" in consideration for Katz being named the "Preferred Sponsor" of the redevelopment project.

2. 42 U.S.C. § 1455(c) states:

"Contracts for loans or capital grants shall be made only with a duly authorized local public agency and shall require that—

\* \* \* \* \*

"(c) There be a feasible method for the temporary relocation of individuals and families displaced from the urban renewal area, and that there are or are being provided, in the urban renewal area or in other areas not generally less desirable in regard to public utilities and public and commercial facilities and at rents or prices within the financial means of the individuals and families displaced from the urban renewal area, decent, safe, and sanitary dwellings equal in number to the number of and available to such displaced individuals and families and reasonably accessible to their places of employment: *Provided*, That the Administrator shall issue rules and regulations to aid in implementing the requirements of this subsection and in otherwise achieving the objectives of this subchapter which shall require that there be established, at the earliest practicable time, for each urban renewal project involving the displacement of families, individuals, or business concerns occupying property in an urban renewal area, a relocation assistance program which shall include such measures, facilities, and services as may be necessary or appropriate in order (1) to determine the needs of such families, individuals, and business concerns for relocation assistance, (2) to provide information and assistance to aid in relocation and otherwise minimize the hardships of displacement, and (3) to assure the necessary coordination of relocation activities with other project activities and other planned or proposed governmental actions in the community which may affect the carrying out of the relocation program."

3. The other three classes of individual plaintiffs in *Norwalk Core* are: (1) "[T]hose Negro and Puerto Rican persons still occupying homes within the Project Area, * * *"; (2) "[T]hose Negro and Puerto Rican persons whose homes located in the Project Area have been demolished by the acts of defendants * * * and who now occupy rental units without the Project Area and within the City of Norwalk, which units are overcrowded * * *"; and (3) "[T]hose low-income Negro and Puerto Rican persons who formerly lived in the City of Norwalk and who, by virtue of the acts of defendants * * *

In March 1968, during the pendency of this class action on appeal, Robert Katz, doing business as Carlton Court, instituted a summary process proceeding in the Circuit Court of Connecticut against the Williamses for non-payment of rent. A judgment in favor of Katz for immediate possession was filed in August 1968. The Williamses applied to this court for a temporary restraining order and a preliminary injunction enjoining Robert Katz from executing the state court judgment and evicting the Williamses. The basis of the Williams' application was that in relocating them in 1966 at a rent of $130 a month, the Agency and Katz, as the Preferred Sponsor, had failed to relocate the Williamses at a rent within their financial means, as obligated by 42 U.S.C. § 1455(c). After a hearing on September 9, 1968, this court issued a temporary restraining order and an order to show cause why a preliminary injunction should not issue.[4] A hearing on the show cause order was held on October 8, 1968.

### The Preliminary Injunction

A motion for a preliminary injunction is addressed to the discretion of the court. Santos v. Bonanno, 369 F.2d 369, 370 (2d Cir. 1966) (per curiam). It is well settled that in order to obtain a preliminary injunction, the plaintiff must clearly show (1) that he has a reasonable probability of succeeding at trial; and (2) that if the preliminary injunction is denied, he will suffer irreparable injury. Chappell & Co. v. Frankel, 367 F.2d 197 (2d Cir. 1966); Goodyear Tire & Rubber Co. v. Topps of

Hartford, Inc., 247 F.Supp. 899, 904 (D. Conn.1965). The degree to which the plaintiff must show that he will succeed at trial "varies somewhat in accordance with the showing [he has] made as to other important factors to be considered * * *." Dinkins v. General Aniline & Film Corp., 214 F.Supp. 276, 279 (S.D. N.Y.1962). As was stated by Judge Frank in Hamilton Watch Co. v. Benrus Watch Co., 206 F.2d 738, 740 (2d Cir. 1953):

> "To justify a temporary injunction it is not necessary that the plaintiff's right to a final decision, after a trial, be absolutely certain, wholly without doubt; if the other elements are present (*i. e.*, the balance of hardships tips decidedly toward plaintiff), it will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation." (Footnote omitted).

Thus, while a hearing on a preliminary injunction is not a forum for a full investigation into the merits of the plaintiffs' claims, if the evidence at the hearing clearly demonstrates the absence of a prospect that the plaintiffs will eventually succeed at trial, the preliminary injunction should be denied. See Blaich v. National Football League, 212 F.Supp. 319, 324 (S.D.N.Y.1962).

### Probability of Success

In order for the Williamses to succeed on the merits of their claim, they must show: (1) that 42 U.S.C. § 1455

now occupy rental units without the City of Norwalk." Although these classes of plaintiffs may not have been articulated with the most desirable precision, it is not necessary, at this point, for the court to determine the classes with exactness. It is sufficient that the court decides that Mr. and Mrs. Williams' claims fall within an appropriate class in this suit.

As to the standing to sue of the association plaintiffs, the Norwalk Chapter of CORE, the Day Street-Washington Village Tenants Association, and the

Spring Street Tenants Association, the Court of Appeals voiced no opinion. Norwalk Core v. Norwalk Redevelopment Agency, 395 F.2d 920, 937–938 (2d Cir. 1968).

4. The TRO was issued upon the agreement of both parties. In any event, 28 U.S.C. § 2283 does not act as a bar to the issuance of an injunction when the suit in the federal court is instituted before any proceedings are brought in a state court. See Treasure Co. v. United States, 169 F.2d 437 (9th Cir. 1948).

(c) and the regulations promulgated thereunder impose the obligation to relocate displacees, in the Williams' circumstances, from this urban renewal project at a rental that does not exceed 20% of the family income; [5] (2) that this obligation is imposed on both the Agency and the Preferred Sponsor, David Katz & Sons; and (3) that in renting the Williamses the Carlton Court apartment at $130 a month, Katz failed to discharge this obligation. As to the first two factors set forth above, the evidence educed at the hearing on the preliminary injunction does raise "questions going to the merits * * * as to make them fair ground for litigation and thus for more deliberate investigation."

## I. The Obligation Imposed by 42 U.S.C. § 1455(c)

Title 42 U.S.C. § 1455(c) provides that contracts for loans and capital grants may be made by the Housing and Home Finance Agency (now HUD) to the Agency only if the contract requires that "there be a feasible method for the temporary relocation of * * * families displaced from the urban renewal area * * * at rents * * * within the financial means of the * * * families displaced * * *." The regulations issued under § 1455(c) establish that with its Survey and Planning Application, the Agency shall submit to HHFA a relocation report consisting of its proposal for relocation of displacees. HHFA, Urban Renewal Manual § 16–1 (1961).[6] In the detailed proposal that must be submitted with the application for a loan and grant, the Agency must describe its relocation program. The regulations governing this application, under the heading "Standards for displacees' ability to pay," require that such standards are to be "expressed in terms of gross rent as percentages of income." HHFA, Urban Renewal Manual § 16–2–1 (1961). The testimony at the hearing by the director of relocation for the Agency established that the percentage used as a standard for displacees' ability to pay is 20% of the family income.[7] It is not necessary to consider on this motion for a preliminary injunction all the details of the "method" adopted for relocation or whether it meets the statutory standard of feasibility. Despite the court's suggestion, the parties did not present evidence to establish the definitive details of the plan.

## II. Responsibility of the Private Defendants

Whether any obligation created by 42 U.S.C. § 1455(c) may be imposed on David Katz & Sons as Preferred Sponsor presents another problem. Again, looking to the regulations, it is clearly stated that relocation may be carried out either by the Agency or a private party under contract. HHFA, Urban Renewal Manual § 16–2–1 (1961). The evidence at the hearing indicated that the Relocation Office of the Agency would often direct displacees to Robert Katz or David Katz & Sons in order to find relocation housing; and that Katz would occasionally rent apartments to displacees at a "reduced rate," making up the rent differential out of his own pocket. The evidence presented raises sufficient questions as to the responsibility of Robert Katz and David Katz & Sons in the relocation of displacees from the urban renewal project to warrant further investigation at trial.

5. There is some confusion as to whether the relocation authorities, in determining ability to pay rent, are to use gross or net income as a standard. The testimony of the director of relocation of the Agency makes it clear, however, that in computing displacees' ability to pay rent, the Agency uses gross income as a standard.

6. The regulations we look to are those which were in effect at the time the Norwalk renewal project was being planned—1958 through 1964. These regulations are substantially the same as the ones now in effect. Compare HUD, Urban Renewal Handbook RHA 7212.1 (1968).

7. Cf. 71 Stat. 301, 42 U.S.C. § 1402(1) (1958).

### III. Satisfaction of the Obligation

■ Assuming that a method for temporary relocation of unquestionable compliance with the statute existed, and also, that these defendants are obligated thereunder,[8] there must also be a reasonable probability that the plaintiffs can establish, at trial, that in renting the apartment at Carlton Court at $130 a month to them, Robert Katz failed to satisfy such an obligation. In other words, the question is whether the rental of $130 a month exceeded 20% of the income of the Williams family at the time of relocation. The evidence at the hearing negated any likelihood of the Williamses establishing this.

The regulations under § 1455(c) direct that in determining the ability of a displacee to pay rent, the Agency must look to the income of the family. HHFA, Urban Renewal Manual § 16–2–1 (1961). Therefore, it is necessary to determine the Williams family group at the time of relocation, February 1966. Until January of 1966 the Williams family consisted of Mr. and Mrs. Williams and one Darlene Davis, Mrs. Williams' daughter-in-law. Darlene's husband, James Davis, was serving in the armed forces. In January of 1966 James was discharged from the service and moved in with his wife and parents. Thus, in February 1966 when the Williams family was relocated, the family consisted of four persons.

The evidence presented indicates that the total income for the family consisting of Mr. and Mrs. Williams and Darlene Davis in 1965 came to approximately $7464.[9] At the time of relocation, the relocation office estimated the annual income of the family consisting of four persons—Mr. and Mrs. Williams and Mr. and Mrs. Davis—at $11,723.[10] Computing the requisite family income necessary to sustain a rent of $130 a month under the 20% standard, one finds the necessary annual income to be $7800. The estimated income of the Williams family for 1966 of $11,723 is well above this figure.[11]

■ The plaintiffs contend that Mr. and Mrs. Davis should not be considered part of the "family" for purposes of determining the displacees' ability to pay rent, and that the income of the Davises should not be added in with that of the Williamses. This is neither logical nor reasonable. It was the Williamses who presented themselves as a family of four to be relocated. Moreover, the fact that the family consisted of four persons necessitated the renting of a two-bedroom

8. Since the determination of these issues must ultimately be determined for all individuals who fall within the classes, the court suggested that a trial on the merits be advanced and consolidated with the hearing on this application. See Fed.R.Civ.P. 65(a)(2). Both parties rejected this suggestion.

9. The breakdown of this family income is as follows: Frank Williams—$1344 from part-time employment and monthly governmental benefit payments under Old Age, Survivors and Disability Insurance; Ethel Williams—$3380 from full-time employment; Darlene Davis—$1300 from full-time employment commencing in June 1965, and $1440 sent by her husband in the armed services.

10. The breakdown of this family income is as follows: Frank Williams—$1105 from OASDI and part-time employment; Ethel Williams—$3088 from full-time employment; Darlene Davis—$3370 from full-time employment; and James Davis—$4160 from full-time employment. It is not clear whether James Davis was employed at the time of relocation, although he subsequently obtained a job. Even if James' estimated income is not computed in, the family income comes to $7563.

11. Even the lesser income for 1965 of $7464 is sufficiently close to the $7800 figure to warrant the $130 a month rental. "In determining whether there has been compliance with section 105(c) of the Act [42 U.S.C. § 1455(c)], courts will evaluate agency efforts and success at relocation with a realistic awareness of the problems facing urban renewal programs. Objections by individual displacees based on too literal an interpretation of the Act's standards could unnecessarily interfere with programs of benefit to the entire community." Norwalk Core v. Norwalk Redevelopment Agency, 395 F.2d at 937.

apartment rather than a one-bedroom apartment, at a substantially larger rental. Finally, this was not a case where the Davises were temporary "guests" staying for a short period of time. The evidence established that Darlene Davis lived with the Williamses for a considerable period prior to relocation and that James and Darlene lived with the Williamses at Carlton Court for more than two years after relocation.

 In actuality, the Williams' complaint is that they can no longer afford the rent at Carlton Court due to a change in circumstances. At the time of relocation, the family income was more than sufficient to meet the rent under the 20% standard. In fact, Mrs. Williams testified that they had no problem in affording the rent at that time. Since then, however, the circumstances of the Williams' financial condition have changed. The Davises moved out, thus subtracting a substantial part of the family income; and it was at this time that the Williamses started having difficulty in making the rent payments. Even if the court were to decide that there was an obligation on the Agency and the Preferred Sponsor to provide relocation housing to displacees at a rental of 20% of the family income, that obligation would not be so extensive as to include the duty to continuously shepherd tenants, after they have been satisfactorily relocated once. The obligation must be looked to, and met, as of the time of relocation. There is not an open-ended obligation to adjust rents and housing conditions to meet subsequent changes in circumstances, no matter how unfortunate these may be. Since it does not appear that there is any real dispute as to these facts—which bear upon the principal issue to be decided at a trial—there is hardly any likelihood that the plaintiffs will be able to prevail on the merits at a later trial of their claims. See Goodyear Tire & Rubber Co. v. Topps of Hartford, Inc., 247 F.Supp. 899.

Accordingly, the application of the plaintiffs, Frank and Ethel Williams, for a preliminary injunction is denied, and the temporary restraining order is dissolved.

So ordered.