David L. COX, individually and as Chairman, BRAC Lodge 3027, et al.,
Plaintiffs,

v.

NORTHWEST AIRLINES, INC.,
Defendant.

No. 4–70–Civ. 373.

United States District Court,
D. Minnesota,
Fourth Division.

Oct. 26, 1970.

William G. Mahoney, Highsaw & Mahoney, Washington, D. C., Si Weisman, Hvass, Weisman, King & Allen, Minneapolis, Minn., for plaintiffs.

Henry Halladay, Dorsey, Marquart, Windhorst, West & Halladay, Minneapolis, Minn., for defendant.

## MEMORANDUM

LARSON, District Judge.

This matter comes before this Court as a result of the granting of defendant's motion for a change of venue from the United States District Court for the District of Columbia. Plaintiffs ultimately seek a declaratory judgment that certain actions of the defendant are in violation of the Railway Labor Act and an injunction permanently enjoining those acts. The issue to be considered presently is plaintiffs' motion for a preliminary injunction pending a hearing on the merits.

The action arises out of a labor dispute between plaintiff Union representing its membership, and defendant Airline. The collective bargaining contract

between the parties which became effective on April 11, 1967, contains in Article XXVIII a duration clause which reads as follows:

"All provisions of this Agreement except as otherwise specifically provided for herein, shall continue in full force and effect until September 30, 1969, and thereafter from year to year unless written notice of intended change desired after September 30, 1969, is served in accordance with Section 6, Title I, of the Railway Labor Act, as amended by either party hereto, at least sixty (60) days prior to September 30, 1969, or September 30 in any year thereafter." *Agreement between Northwest Airlines, Inc., and Brotherhood of Railway, Airline and Steamship Clerks, Freight Handlers, Express and Station Employees.*[1] (Effective date—April 11, 1967) Article XXVIII, p. 124.

On July 29, 1969, BRAC, in accordance with Section 6 of the Railway Labor Act, as amended (45 U.S.C.A. § 156),[2] and the provision in the collective bargaining agreement cited above, served notice that it wanted to modify certain provisions of the collective bargaining agreement. Northwest served BRAC with its counter notice on July 31, 1969. With negotiations stalemated, BRAC on or about February 12, 1970, requested the services of the National Mediation Board (Board). The mediator assigned to the dispute advised the Board that his best efforts to engineer an amicable settlement had been unsuccessful. On May 28, 1970, the Board duly notified the parties of the media-

tor's report and urged them to submit their differences to arbitration. BRAC refused arbitration in a letter to the Board dated June 1, 1970. Northwest, apparently after receiving (on June 3) a copy of the June 1, 1970, BRAC correspondence, sent the Board a letter indicating that it was taking the Board's request to arbitrate under advisement. The Board on June 5, 1970, notified BRAC and Northwest that its services had been terminated under the terms of the Railway Labor Act. No Presidential Emergency Board was appointed to investigate and report on the dispute; hence on or after July 6, 1970, BRAC and Northwest were free to resort to self-help. Thus, on June 12, 1970, BRAC notified Northwest that if the dispute was not settled by July 7, 1970, that BRAC employees would strike at 1:00 A.M. local time on July 8, 1970. Northwest's final offer to BRAC, made on July 6, was rejected by the Union. A last minute effort, on July 7, to reach agreement failed and the work stoppage began as scheduled.

On July 7 Northwest sent two letters to its employees. One, apparently sent in anticipation of the strike, outlined Northwest's final offer to BRAC and indicated that employees who continued to work during the strike would receive pay and benefits set forth in the letter. These were, both parties agreed, substantially the same as the terms contained in Northwest's "final offer." The second letter was, according to Northwest, in response to reports that BRAC had notified all Union members that they would be fined if they crossed picket lines in the event of a strike.[3] It

---

1. Hereafter defendant Northwest Airlines, Inc., will be referred to as Northwest. Plaintiff Brotherhood of Railway, Airline and Steamship Clerks, Freight Handlers, Express and Station Employees will be referred to as BRAC.

2. Section 6 of the Railway Labor Act requires Carrier or Employee representatives to give at least thirty days written notice of any intended change in

agreements which would affect rates of pay, rules or working conditions.

3. A notice posted by BRAC on the employees' bulletin boards informed BRAC members that:
   "At the last regularly scheduled Union meeting held June 16, 1970 * * * a motion was made to fine all Union members $50.00 per day for each day they cross our picket line or report for work

promised employees who continued to work that:

1. They would be protected by Northwest from paying any fines or penalties which BRAC might impose.

2. Northwest would guarantee them against reprisals or discrimination during or after the strike.

3. There would be no enforcement of union membership for nonstriking employees who stopped paying dues or quit the Union because of the strike.

Plaintiffs, in their complaint, allege that Northwest, by using the devices set forth in the two letters, is violating the Railway Labor Act. The specific allegations are first that the offer of individual contracts to nonstriking employees based on the rates of pay and working conditions contained in Northwest's "FINAL OFFER," and the guarantee that there would be no enforcement of Union membership for those who stopped paying dues or quit the Union because of the strike constitute a violation of Section 2 Seventh of the Railway Labor Act (45 U.S.C.A. § 152), which prohibits a carrier from changing "the rates of pay, rules or working conditions of its employees, as a class as embodied in agreements except in the manner prescribed in such agreements or in Section 6 of the Railway Labor Act." Secondly, plaintiffs claim that Northwest's promise not to enforce Union membership

along with its guarantee against fines and penalties which the Union might impose constitute a violation of Section 2 Fourth of the Railway Labor Act (45 U.S.C.A. § 152). That portion of the Act, insofar as relevant, provides "it shall be unlawful for any carrier to interfere in any way with the organization of its employees, * * * or to influence or coerce employees in an effort to induce them to join or remain or *not to* join or *remain* members of any labor organization." (Emphasis supplied.)

The purpose of a preliminary injunction ordinarily is to maintain the status quo between the parties until rights can be fully determined by full trial on the merits.[4] However, this Court has the power to shape relief in a manner which protects the basic rights of the parties,[5] even if in some cases it requires disturbing the status quo.[6] A preliminary injunction should be granted only upon a clear showing by the applicant of his right to such relief,[7] and where the situation clearly demands it.[8]

This Court, when making its determination as to the appropriateness of this extraordinary relief, considers four essential factors.

1. Have the petitioners made a strong showing that they are likely to prevail upon the merits?[9] This does not mean that petitioners must show with absolute cer-

---

in the upcoming strike. The motion was seconded and passed."
Nowhere in the notice did it indicate that any attempt would be made to levy fines on non-union employees who crossed the picket lines.

4. Missouri-Kansas-Texas Railroad Co. v. Randolph, 182 F.2d 996 (8th Cir. 1950); Pratt v. Stout, 85 F.2d 172 (8th Cir. 1936).

5. *Cf.* Unicon Management Corp. v. Koppers Co., 366 F.2d 199 (2nd Cir. 1966).

6. *Cf.* United States v. Barrows, 404 F.2d 749, 752 (9th Cir. 1968), cert. den. 394 U.S. 974, 89 S.Ct. 1468, 22 L.Ed.2d 754.

7. United States v. Borden Co., 347 U.S. 514, 74 S.Ct. 703, 98 L.Ed. 903 (1954); Congress of Racial Equality v. Douglas,

318 F.2d 95 (5th Cir. 1963), cert. den. 375 U.S. 829, 84 S.Ct. 73, 11 L.Ed.2d 61.

8. Dymo Industries, Inc. v. Tapeprinter, Inc., 326 F.2d 141 (9th Cir. 1964); Fowler v. United States, 258 F.Supp. 638 (D.C.Cal.1966); Freeport Sulphur Co. v. United States, 199 F.Supp. 913 (D.C. N.Y.1961).

9. Virginia Petroleum Jobbers Assoc. v. Federal Power Comm., 104 U.S.App.D.C. 106, 259 F.2d 921, 925 (1958); Ikirt v. Lee Nat. Corp., 358 F.2d 726 (3rd Cir. 1966); Crane Co. v. Briggs Manufacturing, 280 F.2d 747 (6th Cir. 1960); Norwalk C.O.R.E. v. Norwalk Redevelopment Agency, 296 F.Supp. 456 (D.C.Conn. 1968).

tainty that they will prevail at trial,[10] but they must show substantial probability of success.[11] The degree of probable success will vary somewhat in accordance with the showing made on the other relevant factors.[12]

2. Have the petitioners shown irreparable injury?[13] Injuries, no matter how substantial, which can be ascertained or approximated and adequately compensated at law do not provide a basis for equitable relief. However, the sufficiency of an injury may vary somewhat with the strength of the showing or possibility of success on the merits.[14]

3. Will the granting of an injunction substantially impair the interests of the other parties to the proceedings?[15] This Court must consider the effect of the requested relief on the defendant. Saving one party from irreparable injury at the expense of irreparable injury to another ordinarily

does not qualify as equitable relief.

4. How will the granting of an injunction affect the public interest?[16] The instant case involves a statutory scheme devised by Congress to regulate in the public interest the method and scope of economic bargaining between common carriers and the organizations representing their employees. Congress, mindful of the evils experienced by the public as a whole during period of uncontrolled labor strife, wisely determined that limits would have to be placed on the activities of both parties. It is the duty of this Court to give consideration to the interests of the public in having the services of the carrier resumed on a full time basis as soon as possible as well as to insure the parties to the dispute independence in their organization attempts and in pursuit of their economic goals.[17]

10. Unicon Management Corp. v. Koppers Co., 366 F.2d 199 (2nd Cir. 1966); Studebaker Corp. v. Allied Products Corp., 256 F.Supp. 173 (D.C.Mich.1966); United States v. Pennzoil Co., 252 F. Supp. 962 (D.C.Pa.1965); Kingsberry Homes Corp. v. Gwinnett County, Ga., 248 F.Supp. 765 (D.C.Ga.1965). *Contra:* Eagle-Freeman-Roedelheim Co. v. Allison Mfg. Co., 204 F.Supp. 679, 682 (D.C. Pa.1962); *Cf.* Fowler v. U. S., 258 F. Supp. 638, 644 (D.C.Cal.1966).

11. H. E. Fletcher Co. v. Rock of Ages Corp., 326 F.2d 13, 17 (2d Cir. 1963); Industrial Electronics Corp. v. Cline, 330 F.2d 480, 482 (3rd Cir. 1964); Ikirt v. Lee Nat. Corp., 358 F.2d 726 (3rd Cir. 1966).

12. Norwalk C.O.R.E. v. Norwalk Redevelopment Agency, 296 F.Supp. 456 (D.C. Conn.1968); Cf. Dino DeLaurentiis Cinematografica, S.p.A. v. D–150 Inc., 366 F.2d 373 (2d Cir. 1966); Kontes Glass Co. v. Lab Glass, Inc., 373 F.2d 319 (3rd Cir. 1967).

13. Virginia Petroleum Jobbers Assoc. v. Federal Power Comm., 104 U.S.App.D.C. 106, 259 F.2d 921, 925 (1958); Joseph Bancroft & Sons Co. v. Shelley Knitting

Mills, Inc., 268 F.2d 569 (3rd Cir. 1959); Celebrity, Inc. v. Trina, Inc., 264 F.2d 956 (1st Cir. 1959); Meiselman, v. Paramount Film Distributing Corp., 180 F.2d 94 (4th Cir. 1950); Sims v. Greene, 161 F.2d 87 (3rd Cir. 1947).

14. See fn. 12, *supra.*

15. Virginia Petroleum Jobbers Assoc. v. Federal Power Comm., 104 U.S.App.D.C. 106, 259 F.2d 921, 925 (1958); C.O.R.E. v. Douglas, 318 F.2d 95 (5th Cir. 1963), cert. den. 375 U.S. 829; Commercial State Bank of Roseville v. Gidney, 174 F. Supp. 770 (D.C.D.C.1959), aff'd, 108 U.S. App.D.C. 278, 278 F.2d 871.

16. Virginia Petroleum Jobbers Assoc. v. Federal Power Comm., 104 U.S.App.D. C. 106, 259 F.2d 921, 925 (1958); American Smelting & Refining Co. v. Pennzoil United, Inc., 295 F.Supp. 149 (D.C.Del. 1969).

17. The Railway Labor Act aims to achieve a myriad of objectives oftentimes at cross purposes with one another. For example, one primary objective is to encourage the parties to a dispute to utilize every conceivable method of settling their differences before resorting to work stop-

The foregoing factors must be considered by the Court in evaluating each of the petitioners' allegations.

## VIOLATIONS OF SECTION 2 SEVENTH OF THE RAILWAY LABOR ACT (45 U.S.C.A. § 152)

Section 2 Seventh of the Railway Labor Act provides:

"No carrier, its officers, or agents shall change the rates of pay, rules, or working conditions of its employees, as a class, as embodied in agreements except in the manner prescribed in such agreements or in Section 156 of this title."[18]

BRAC alleges that Northwest by paying wages in excess of those provided for in the collective bargaining agreement is violating Section 2 Seventh quoted above. They base this charge primarily upon the decision by the United States Supreme Court in Brotherhood of Railway & Steamship Clerks, etc. v. Florida E. C. Ry.[19] There, after exhausting mandatory procedures, the parties had failed to reach agreement over proposed changes in wages and working conditions. A Presidential Emergency Board, constituted under Section 10 of the Railway Labor Act, made a recommendation that was accepted by all the carriers except Florida East Coast (hereafter F.E.C.). Further mediation under the Act still failed to bring any accord between the parties. Both parties refused arbitration and a strike by nonoperating unions ensued. Operating union members honored the picket lines. F.E.C. after a short shutdown resumed operation with a work force consisting of supervisory personnel and replacements with whom it made individual employment agreements which were substantially different from the existing collective bargaining agreements. The Government brought this suit in which the nonoperating unions intervened as plaintiffs. They alleged that the actions of F.E.C. in making unilateral variations from the collective bargaining agreement violated Section 2 Seventh of the Act. The Court of Appeals had determined in a parallel suit by the operating unions that F.E.C. could not reject the entire existing collective bargaining agreement but that they could make such variations as the District Court found were reasonably necessary for F. E.C. to operate under strike conditions.

F.E.C. applied to the District Court for permission to make a series of departures from the collective bargaining agreement. Of the eight requests, only one was unconditionally granted. Notably, among those denied was a request by F.E.C. to treat union shop agreements as void and unenforceable as to replacement workers.[20]

The Supreme Court affirmed, holding that a carrier, although not under an absolute duty to maintain operations, does

---

pages. If either party fails to do so, the Courts generally refuse to give any injunctive relief to the offending party from the consequences of the strike. This is apparently a negative inducement to the party involved and any interested observers to exhaust all alternatives short of a strike the next time they are involved in a labor dispute. Unfortunately what does the Court do if the activity sought to be enjoined itself constitutes a violation of a portion of the Act which is aimed at preserving the integrity of the bargaining agreement during a strike or at protecting the right of employer or employee to organize for purposes of collective bargaining? To refuse an injunction in a situation such as that would hardly serve the public interest. Where the public interest lies in a situation such as the one facing this Court is a question which is difficult to resolve, not only because of the multitude of interests that one must consider but also because of the nearly impossible task of assigning relative weights to each of them. The Court may be faced with a dilemma where regardless of whether it acts to enjoin or refuses to, some interest of the public will be adversely affected.

18. 48 Stat. 1188, 45 U.S.C.A. § 152 (Seventh).

19. 384 U.S. 238, 86 S.Ct. 1420, 16 L.Ed.2d 501 (1966).

20. See Florida East Coast Ry. v. United States, 348 F.2d 682, 684 (5th Cir. 1965).

owe the public an obligation to make an effort to maintain service during a strike. In light of this, if the carrier's right to self-help is to be a meaningful one, Section 2 Seventh of the Act cannot be applied after a strike has begun. However, the Court went on to point out that although the carrier was not subject to the restrictions in Section 2 Seventh of the Act, that the collective bargaining agreement was still the standard and that any deviations must be confined to those legitimately necessary in order to enable the carrier to operate in light of its diminished and less experienced work force. The reasoning of the Court in this matter is germane to the issues in the instant case.

> "These collective bargaining agreements are the product of years of struggle and negotiation; they represent the rules governing the community of striking employees and the carrier. That community is not destroyed by the strike, as the strike represents only an interruption in the continuity of the relation. Were a strike to be the occasion for a carrier to tear up and annul, so to speak, the entire collective bargaining agreement, labor-management relations would revert to the jungle. *A carrier could then use the occasion of a strike over a simple wage and hour dispute to make sweeping changes in its work rules so as to permit operation on terms which could not conceivably have been obtained through negotiation. Having made such changes, a carrier might well have little incentive to reach a settlement of the dispute that led to the strike. It might indeed have a strong reason to prolong the strike and even break the union. The temptation might be strong to precipitate a strike in order to permit the carrier to abrogate the entire collective bargaining agreement on terms most favorable to it."* [21] (Emphasis supplied.)

BRAC interprets this as a mandate that there will be no deviation by the carrier from the terms of the collective bargaining agreement during a strike without prior application to and approval of the District Court. Northwest maintains that the holding has to be limited to railway carrier disputes because the duration clause in railway collective bargaining agreements provide that the contract remains in force unless and until change is agreed upon by the parties. It alleges that in the dispute before this Court, the collective bargaining agreement does not have this feature and hence once the mandatory procedures under the Act are exhausted and the collective bargaining agreement has expired, it is free to make any changes it desires in wages, rules and other working conditions. Northwest's contention is without merit. The Supreme Court nowhere in the opinion even mentioned —much less relied upon—this alleged peculiarity of railroad collective bargaining agreements. What is more, the arguments advanced by the Court for protecting the integrity of the collective bargaining agreement and the parade of horrors which the Court feels would result from a failure to do so, are not dependent upon or affected in any manner by an interpretation of the duration clause of the collective bargaining agreement. That this is quite clearly the case is emphasized by the fact that the Court clearly held that Section 2 Seventh does not apply during a strike and relied upon the overall thrust of the Railway Labor Act as a rationale for limiting departure from the terms of the collective bargaining agreement. The Court said: "[The carrier's] power to make new terms and conditions governing the new labor force is strictly confined, if the spirit of the Railway Labor Act is to be honored." [22] It can hardly be seriously asserted that the "spirit" of the Act is determined by language selected by the draftsmen of duration clauses in collective bargaining agreements.

21. 384 U.S. at 246–247, 86 S.Ct. at 1424.

22. 384 U.S. at 247, 86 S.Ct. at 1425.

Northwest makes an alternative argument, however, which bears careful attention. It contends that, assuming the *Florida East Coast* case holds that the collective bargaining agreement is the norm for working conditions, rules, etc., even after a strike begins, it applies only to those portions of the collective bargaining agreement which *have not been the subject of § 6 reopeners* [23] *and which have hence not been subjected to the mandatory procedures dictated by the Railway Labor Act.* Northwest argues that once a contract term has been reopened to negotiation and the controversy subjected to all the mandatory procedures in the Act, the terms of that particular contract provision are subject to unilateral change by the employer in the event of a strike.

There is language in the *Florida East Coast* opinion which would support this view. The Court said concerning the pay increase and notice to be given in the event of layoff or job abolition which were the issues precipitating the labor dispute and which had been subjected to all mandatory procedures:

> "If [they were] all that were involved * * * the problem would be simple. The complication arises because the carrier * * * finds it necessary or desirable to make *other* changes in the collective bargaining agreement.[24] (Emphasis supplied.)

The possible import of this phrase is heightened when one realizes that as nearly as can be deduced from the lower Court opinions, none of the proposed changes which gave rise to the litigation had been subjected to negotiation and mediation pursuant to the Act. There is thus a strong implication that the Court might have sustained the Railway's right to unilaterally change wages and notice requirements without prior District Court approval.

On the other hand, an interpretation such as this would not appreciably diminish the type of carrier abuse the Court seemed to fear if the collective bargaining agreement were not considered the employment norm.[25] It would be a simple matter for the carrier, once negotiations started, to propose at least minor changes in all contract provisions. That way, if the parties were unable to achieve a satisfactory resolution of their major differences and a strike resulted, the carrier, under Northwest's interpretation, would be entitled to make unilateral changes in wages, rules, working conditions, etc., without regard to the provisions of the collective bargaining agreement.

■ It will not, however, be necessary for this Court to resolve this issue, at least not at this time. In addition to the doubt reflected above as to the ultimate outcome of plaintiffs' complaint on the merits, it is not entirely clear that Northwest's change in the conditions of employment works any injury at all, much less irreparable injury on the plaintiffs. The evils foreseen by the Supreme Court as a result of unilateral changes by the carrier arise primarily out of the fact that the terms offered would be substantially less advantageous than those contained in the collective bargaining agreement. In the instant case the terms offered by Northwest are by and large better than those required by the collective bargaining agreement. Thus, it is costing Northwest more to operate under their current contracts than it would to conform to the collective bargaining agreement. This adds to, not detracts, from the economic leverage of the Union's strike effort. This Court is cognizant of the fact that an offer of terms more attractive than the collective bargaining agreement may carry with it some evils of its own. However, it feels that in light of the doubt as to plaintiffs' ultimate success and the uncertainty as to injury there is not a sufficient showing

---

23. See fn. 2, *supra*.

24. 384 U.S. at 245, 86 S.Ct. at 1424.

25. See fn. 21, *supra*, and accompanying test.

to warrant a preliminary Order enjoining this action by Northwest.

■ The guarantee by Northwest against enforcement of the Union security agreement is another matter entirely. Regardless of which of the proposed interpretations of the *Florida East Coast* case were applied, this change would be prohibited. The exhibits submitted by the parties make clear that at no time was the Union security agreement (Section XXVII of the collective bargaining agreement) reopened for negotiation. Northwest admits that BRAC is still the bargaining representative for Northwest's clerical employees. As bargaining representative BRAC is injured by the action of Northwest in disregarding this valid provision in the current bargaining agreement. Not only does Northwest's refusal to abide by the security agreement affect the prestige of the Union, but it may well have an effect upon the length of the strike, the terms of the settlement, and the strength of the Union after settlement, all of which are largely unascertainable in terms of money damages, thereby precluding an effective remedy at law.

There is no hardship worked on Northwest by requiring it to cease activity which is prohibited under the very construction of the law that Northwest urges upon this Court. There is no disservice to the public by such an action. It does not appear that Northwest's efforts to maintain service will be thwarted by its inability to guarantee non-enforcement of the Union security agreement. If it can later demonstrate that the limitation seriously interferes with strike operations, application may be made to this Court for approval of any changes deemed necessary. On the other hand, there is a public interest in maintaining the integrity of collective bargaining agreements, which is evidenced by the importance placed by Congress on this matter when promulgating the Railway Labor Act. It should also be pointed out that the existence of replacement workers on the job, none of whom Northwest is required to dismiss after the strike is over to make room for returning Union members, and none of whom ostensibly will be required to join the Union, is hardly a situation calculated to bring the strike to a speedy termination. Hence no changes in the Union security agreement can be made by Northwest except by approval of this Court upon a clear showing of the need for the changes sought. This ruling applies to replacement workers being hired during the strike. There are additional reasons, to be dealt with hereafter, why such a guarantee when made to Union members is also subject to proscription.

### VIOLATIONS OF SECTION 2 FOURTH OF THE RAILWAY LABOR ACT (45 U.S.C.A. § 152)

■ BRAC contends that the promise by Northwest to protect employees returning to work from enforcement of the Union security agreement also violates Section 2 Fourth of the Act (reproduced *supra* insofar as relevant) and should be enjoined. This Court agrees. The plain language of the statute makes it clear that it is impermissible to influence an employee not to remain a member of a Union. It is equally clear that the guarantee against enforcement of Union membership had that effect. The implication of the promise was clear—if employees would quit the Union and come back to work, Northwest would protect them from having to rejoin the Union or from being made subject to any provisions of the Union security agreement. It is apparent that every action taken by an employer during a strike may operate as an influence on a striker to leave the Union and return to work. Likewise, the longer an employer is able to maintain operations during a strike, the more coercive become the economic effects of the strike upon the striker. Obviously, every action calculated to aid in continuing operation during a strike could not be forbidden or virtually every effort made by the carrier toward self-help would fall within the proscription of Section 2 Fourth.

This would render nugatory the carrier's right to self-help.

The disputed action, however, is not of this nature. The only purpose which could seemingly be achieved by the notice sent to BRAC members by Northwest is resignation by the employees from the Union for purposes of going back to work. This can easily be distinguished from an act calculated to maintain operations during the strike where the only coercion or influence on the members to resign from the Union is that which naturally flows from an employer maintaining operations during any strike situation.[26]

The damage to BRAC by Northwest's actions are clearly irreparable at law. Although whatever dues loss results from diminished union membership can easily be recovered in an action for damages, this is not BRAC's major concern. It is impossible to calculate the effect that membership loss to BRAC would have on the eventual outcome of the strike, on the final contract settlement, on the effectiveness of the Union at the bargaining table, or on the morale and will of the remaining union members to continue the strike.

It is not apparent that enjoining the activity of Northwest will work any great hardship on Northwest. It would hardly be equitable relief for this Court to refuse to grant an injunction because to do so would prevent defendant from illegally obtaining a work force. This is true even if defendant's alternatives are somewhat limited. Although the public certainly has an interest in seeing Northwest maintain service, it has an equal interest in seeing that Federal labor policy is effectuated. Preventing Northwest from directly inducing Union members to leave the Union protects the organizational integrity of the employees while at the same time it does not completely foreclose Northwest from continuing operations. In addition, Northwest is operating only a fraction of its prestrike routes. It is no less in the interest of the public to have the strike ended and full service returned than it is to have partial service during the active course of the dispute. Thus Northwest's actions, although beneficial in regard to service in the short run, might be ultimately detrimental if it prolonged the length of the strike.

There is no reason to enjoin the promise by Northwest to protect employees from any fines or penalties imposed by BRAC. This is a largely illusory controversy. BRAC admits that it has no authority to fine non-members, and the evidence clearly shows that they never implied attempting to do so.[27] BRAC also indicated during argument that it had no objections to Northwest reimbursing union members for any fines they would have to pay. Obviously, if this actually took place, the additional cost of $50 per day per employee would work a great economic hardship on Northwest and provide a corresponding benefit to BRAC's strike fund. In light of the ruling that Northwest must adhere to the Union security agreement it certainly cannot be maintained that Northwest's offer to pay Union members' fines is inducing people to leave the Union. The Union concedes that an individual can resign from the Union and return to work without being subject to the fine. One of the biggest inducements to leave is the spector of the $50 per day fine. There is no great likelihood that Northwest's offer constitutes a Section 2 Fourth violation as to

---

26. The basic purpose of a strike is the application of economic pressure on the employer. Correlatively, there is also financial hardship suffered by the employees. The longer the strike continues, the more vulnerable the individual striking employees become to offers of employment. Not only do the short term economic consequences become more immediate as the strike continues, but there is the unsettling awareness that other workers are learning how to perform the strikers' jobs and that there is no requirement that the employer replace them with strikers when the work stoppage ends.

27. See fn. 3, *supra.*

which plaintiff would ultimately prevail, and it appears there would be no injury if a Union member took advantage of Northwest's offer because, as previously pointed out, BRAC seems to feel that the net effect of any indemnification by Northwest is advantageous rather than damaging to it.

## EFFECT OF § 8 OF THE NORRIS-LA GUARDIA ACT

■ Defendant's final argument is that even if all of the conditions for equitable relief are present, Section 8 of the Norris-LaGuardia Act, 29 U.S.C.A. § 108, prohibit granting an injunction on the facts of this case.

Section 8 of the Norris-LaGuardia Act provides:

"No restraining order or injunctive relief shall be granted to any complainant who has failed to comply with any obligation imposed by law which is involved in the labor dispute in question, or who has failed to make every reasonable effort to settle such dispute either by negotiation or with the aid of any available governmental machinery of mediation or voluntary arbitration." [28]

Defendant Northwest insists that BRAC's refusal to submit the controversy to arbitration precludes this Court from granting the requested injunctive relief. This Court is constrained to disagree.

It is well settled that Section 8 of the Norris-LaGuardia Act must be accommodated with the provisions of the Railway Labor Act.[29] However, accommodation does not mean Section 8 assumes an unquestioned priority in application. The process of accommodation was described by the District of Columbia Court of Appeals in Brotherhood of Railroad Trainmen v. Akron & B. B. R. R.[30]

"It may be that in a particular case the District Court might conclude that the imperatives of the Railway Labor Act override Section 8—a statutory focusing so to speak of an equity approach whereby lack of clean hands may be overcome by a balancing of interests, particularly where it is the public interest involved. In a particular case the District Court might conclude that the question of the applicability of Section 8 was doubtful, would require time to explore, and that the restraining order should issue forthwith to avoid jeopardizing the Railway Labor Act. Such approaches would recognize that Section 8 of the Norris-LaGuardia Act has some applicability, and is a legislative instruction that weighs heavier in the scale than the clean hands doctrine taken merely as a general equity maxim, yet is overborne by requirements of the Railway Labor Act." [31]

Defendant in support of its position cites Brotherhood of Railroad Trainmen, etc. v. Toledo, P. & W. R. R.[32] and also refers the Court to footnote 8 in the *Florida East Coast* case.[33] The Supreme Court in *Toledo* reversed the Court of Appeals which had affirmed the trial Court's granting of an injunction restraining the union from interfering with the railroad's operations and property. The Court held that the railroad's refusal to submit the underlying contract dispute to arbitration precluded granting injunctive relief regardless of the fact that the strike was resulting in violence and damage to railroad property.

---

28. 47 Stat. 72; 29 U.S.C.A. § 108.

29. Brotherhood of R.R. Trainmen v. Chicago, R. & I. R.R., 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622 (1957); Brotherhood of R.R. Trainmen v. Akron & B.B. R.R., 128 U.S.App.D.C. 59, 385 F.2d 581, 613 (1967); Piedmont Aviation, Inc. v. Airline Pilots Assn. Internat'l, 416 F.2d 633, 636 (4th Cir. 1969).

30. 128 U.S.App.D.C. 59, 385 F.2d 581 (1967).

31. Id. at 614.

32. 321 U.S. 50, 64 S.Ct. 413, 88 L.Ed. 534 (1944).

33. 384 U.S. at 247–248, 86 S.Ct. 1420.

There are two factors present in the *Toledo* case which came to the attention of this Court. First of all, the union, in *Toledo*, had agreed to submit the dispute to arbitration at the time of the railroad's refusal. Secondly, the Supreme Court in *Toledo* was faced with a situation in which by applying Section 8 of the Norris-LaGuardia Act they would be promoting the purpose of the Railway Labor Act. The latter was designed to encourage settlement of disputes without resorting to the ultimate weapon of a work stoppage. Thus by applying Section 8 and refusing an injunction, the Supreme Court was promoting the purposes of the Railway Labor Act and all the public interests incorporated therein at the expense of the private property rights of one railroad—rights, which, incidentally, could be adequately protected by a suit at law for damages.

The dispute before this Court does not present a situation such as the one in *Toledo*. In the first instance, we do not have Northwest agreeing to submit to arbitration while the Union refused. Although it cannot be denied that the Union was the first to refuse, Northwest, despite the fact that it was apparently aware of BRAC's refusal,[34] chose not to make any decision at all. It did not refuse but neither did it agree to submit to arbitration; it took the decision under consideration. There is no indication that it has up to this time committed itself one way or the other. It is here that footnote 8 in the *Florida East Coast* case becomes relevant.

In *Florida East Coast* both the union and the carrier had refused to submit the question to arbitration, resulting in the strike. During the course of the strike, the union changed its position and agreed to arbitration; but the railroad still refused. In footnote 8 the Supreme Court acknowledged that the clean hands doctrine of Section 8 would apply to the railroad's suit to obtain relief from provisions of the collective bargaining agreement as well as to a request for an injunction. However, it distinguished the facts in *Florida East Coast* from *Toledo* on the basis that in *Florida East Coast* both parties had refused arbitration, resulting in the strike. The Court thereby apparently established some sort of relativity test. If one party accepts arbitration and the other refuses, precipitating a strike, the refusing party is barred from equitable relief; but if both parties refuse arbitration and a strike results, neither party is barred. As previously pointed out, here we have the in-between case— one party refuses, the other does nothing. Northwest can argue that since the Union had refused arbitration there was no purpose in its accepting. However, had the carrier, being aware of the Union's refusal, agreed to submit the dispute to arbitration, the Union's position would possibly have changed, and a strike been averted. At any rate Northwest failed to make "every reasonable effort" to settle the dispute within the plain meaning of Section 8. Thus, the situation here is closer to that of *Florida East Coast* than to *Toledo*.

This Court's decision not to apply Section 8 of Norris-LaGuardia does not rest on the above grounds alone. More importantly it should be noted that application of Norris-LaGuardia in the instant

---

34. Defendant's Exhibit K is a reproduction of defendant's copy of BRAC's letter to the National Mediation Board, dated June 1, 1970. The letter, so far as relevant, says:

"It is our [BRAC's] considered judgment that the issues in dispute do not lend themselves to arbitration. Accordingly, we respectfully reject the Board's request to arbitrate the dispute."

The receipt date stamped on the letter is June 3, 1970. Thus, it appears that Northwest was aware of BRAC's rejection when it sent its response to the Board on June 4, 1970. (Defendant's Exhibit L.)

"Your letter of May 28, 1970 in which the parties are requested and urged to submit the controversy to arbitration * * * was received in this office June 1, 1970. Northwest Airlines is taking your request into consideration and will advise you as to our position at the earliest possible moment."

case would not, as in *Toledo,* clearly foster the purposes behind the Railway Labor Act. The activities sought to be enjoined appear to be plain violations of Section 2 Fourth and Seventh of the Railway Labor Act. Thus, application of Section 8 of the Norris-LaGuardia Act to prohibit an injunction would permit continuing violations of the Railway Labor Act. This was not the result sought to be achieved by the Supreme Court in *Toledo.*

There the Court balanced the objectives sought to be achieved by Congress through the Railway Labor Act against the private property rights of a single railroad. In the instant case this Court is faced with more difficult alternatives. It must balance the objectives of the Railway Labor Act that would be furthered by refusing to grant the injunction against others which would be promoted if the injunction were granted.

Any inducement to arbitrate which would flow from a refusal in this case to grant equitable relief would in all likelihood operate *in futuro.* It is doubtful that a denial of plaintiffs' request for injunctive relief will result in an immediate submission of the dispute to arbitration. Even if BRAC were to reverse its decision in this matter because of such a denial, it is impossible to ascertain what position would be adopted by Northwest. A denial of injunctive relief is more likely to affect the course of conduct pursued by the parties in future labor disputes than it is their conduct in the instant case.

To the contrary, there will be the immediate and certain effect of preventing further violations of Section 2 Fourth of the Railway Labor Act if Northwest is enjoined from encouraging BRAC members to leave the Union. It is unfortunate that the parties here did not submit the dispute to arbitration and thereby avert a strike. However, for this Court to provide an after the fact inducement to arbitrate at the expense of aggravating an already unfortunate situation by condoning violations of other provisions of the Railway Labor Act would require

a most imprudent mechanical application of the Norris-LaGuardia Act and a complete disregard of the purposes of Congress in formulating the Railway Labor Act.

## ORDER

Plaintiffs moved for an Order enjoining defendant from engaging in the following activities alleged to be violations of the Railway Labor Act (hereinafter referred to as Act):

1. Offering to employees individual contracts containing rates of pay, rules and working conditions constituting a change from those contained in the current collective bargaining agreement in violation of Section 2 Seventh of the Act.

2. Guaranteeing to employees subject to the collective bargaining agreement that the Union security agreement will not be enforced against them, which action constitutes a change from those conditions contained in the current collective bargaining agreement in violation of Section 2 Seventh of the Act.

3. Guaranteeing Union members against enforcement of Union security agreement if they quit Union membership and return to work, such action being a violation of the provisions of Section 2 Fourth of the Act.

4. Guaranteeing to employees represented by plaintiff Union that if they continue to work during the strike that defendant would protect such employees from paying any fine or penalty imposed upon them, such action being a violation of Section 2 Fourth of the Act.

The Court has heard arguments and examined the memoranda, exhibits and affidavits submitted for its consideration. On the basis thereof and on all the files, records and proceedings,

It is ordered:

1. That plaintiffs' motion to enjoin defendant from offering to employees individual contracts containing rates of pay, rules and working conditions more advantageous than those contained in the current collective bargaining agree-

ment be, and it is hereby, denied, except as to those working conditions embodied in the Union security agreement.

2. That plaintiffs' motion to enjoin defendant from guaranteeing employees represented by plaintiff Union against enforcement of the provisions of the Union security agreement be, and it is hereby, granted.

3. That plaintiffs' motion to enjoin defendant from guaranteeing Union members against enforcement of Union security agreement if they quit membership in the Union and return to work be, and it is hereby, granted.

4. That plaintiffs' motion to enjoin defendant from guaranteeing employees represented by plaintiff Union that if they continue to work during the strike that defendant will protect such employees from paying any fine or penalty imposed upon them be, and it is hereby, denied.