EQUAL EMPLOYMENT OPPORTUNI-
TY COMMISSION, Plaintiff-Appellee,

v.

UNITED AIR LINES, INC.,
Defendant-Appellant.

Nos. 84–1238, 84–1398.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 14, 1984.

Decided Feb. 12, 1985.

Karen MacRae Smith, E.E.O.C. Ofce. of Gen. Counsel, Washington, D.C., for plaintiff-appellee.

Linda S. Puvogel, Law Div. U.A.L., Chicago, Ill., for defendant-appellant.

Before CUDAHY and POSNER, Circuit Judges, and SWYGERT, Senior Circuit Judge.

POSNER, Circuit Judge.

■ In 1978 Congress amended the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 *et seq.*, to raise the permissible minimum mandatory retirement age from 65 to 70. Age Discrimination in Employment Act Amendments of 1978, § 3(a), Pub.L. 95–256, 92 Stat. 189. In 1979 United Air Lines forced several of its ground employees to retire at the age of 65, and the Equal Employment Opportunity Commission brought this suit against United, alleging that it had violated the Act. The key issue in the lawsuit has turned out to be the effective date of the 1978 amendments, section 2(b) of which provides that "in the case of employees covered by a collective bargaining agreement which is in effect on September 1, 1977, ... and which would otherwise be prohibited by the amendment [raising the minimum mandatory retirement age to 70], the amendment [to 29 U.S.C. § 623(f)(2) ] shall take effect upon the termination of such agreement or on January 1, 1980, whichever occurs first." The second amendment to which section. 2(b) refers—the amendment that is deferred till termination or January 1, 1980 —curtails the right granted the employer by the original act "to observe the terms of a bona fide ... employee benefit plan such as a retirement, pension, or insurance plan, which is not a subterfuge to evade the purposes of this chapter." The effect of the deferral of this amendment is that if a collective bargaining agreement does not entitle the workers covered by it to continue working to age 70, the employer can continue to observe the terms of his retirement plan until the collective bargaining agreement terminates or January 1, 1980, arrives—whichever happens first.

In 1975 United had signed a collective bargaining agreement with the union representing the employees in this case. The agreement was subject to section 6 of the Railway Labor Act, as amended, 45 U.S.C. § 156, which, so far as relevant here, required United to give the union written notice of any intended change in the collective bargaining agreement relating to pay, work rules, or working conditions, and forbade it to put any such change into effect until certain procedures designed to head off a strike were exhausted. The agreement contained a provision that "the retirement ages under [United's pension plan] are: normal retirement, age 65; early retirement, age 55 and ten years continuous service"; and although the Commission argues otherwise, there can be very little doubt that this provision empowered (without compelling) United to force any employee to retire at 65.

United issued a section 6 notice in September 1978; and although the notice did not mention changes in retirement, in the course of the ensuing negotiations United submitted a proposal to modify its pension plan and told the union that the plan would allow employees to work beyond the age of 65. On January 28, 1979, the "cooling off" period imposed by the Railway Labor Act ended and United was free to put into effect any changes referred to in its section 6 notice. On March 31 the union struck over issues unrelated to retirement age, and on May 24, after the strike ended, a new collective bargaining agreement went into effect. Beginning on that day United allowed its ground employees to continue working to age 70, although the language of the previous collective bargaining agreement, quoted earlier, was carried forward unchanged in the new agreement.

The district judge divided the employees involved in this case into two groups. One consists of those forced to retire at 65 before the strike began on March 31, 1979; the other of those forced to retire at 65 between March 31 and May 24, when the new agreement was signed and United stopped making ground employees retire before 70. The district judge held that the 1978 amendments did not apply to the first group but did apply to the second, on the ground that the old collective bargaining agreement terminated when the strike began. He therefore dismissed the Commission's complaint as to the first group and entered judgment for the Commission as to the second. 575 F.Supp. 309. Both the Commission and United Air Lines have appealed.

There are just two questions we need decide: whether the collective bargaining agreement was ever subject to section 2(b) of the 1978 amendments, and if so, when it stopped being subject to it. The Commission argues that since section 2(b) applies only to agreements that would otherwise violate the prohibition against mandatory retirement before 70, and since the agreement in this case made 65 the date of "normal" rather than "mandatory" retirement, the agreement never was subject to section 2(b). We disagree. By specifying 65 as the age of normal retirement, the collective bargaining agreement entitled United to force employees to retire at 65 whether or not they were fit to keep on working. This is mandatory (compulsory, required) retirement for purposes of the Age Discrimination in Employment Act, as the Supreme Court has held with reference to the identical wording in another of United Air Lines' collective bargaining contracts. *United Air Lines, Inc. v. McMann*, 434 U.S. 192, 196, 98 S.Ct. 444, 447, 54 L.Ed.2d 402 (1977); see also *Aldendifer v. Continental Air Lines, Inc.*, 650 F.2d 171, 173 (9th Cir.1981). Otherwise an employer could get around the Act very easily by setting a "normal" retirement age of 65 (or 60, or 55) and retaining a few workers after they reached that age.

It is true that since "normal" retirement gives an employer leeway to retain employees after they have reached retirement age, United might not have had to violate the collective bargaining agreement in order to comply with the statutory increase in the minimum mandatory retirement age from 65 to 70. But since the agreement entitled

United to force employees to retire at 65, the agreement would have violated the new statutory minimum age but for section 2(b), and that is all that is necessary to allow United to continue observing the terms of its retirement plan, which established a normal retirement age of 65, until the agreement terminated (but no later than January 1, 1980). If the Commission's interpretation prevailed, it would be very hard to see what Congress had accomplished in section 2(b), for it would be the rare employer who bound himself never to keep an employee beyond retirement, and yet only if he did so bind himself would he come within the shelter of the section as the Commission reads it.

The next question is when the collective bargaining agreement terminated. The agreement provided that it "shall remain in full force and effect through November 1, 1978, and thereafter shall be subject to change by service of notice as provided for in Section 6" of the Railway Labor Act. The logic of the Commission's argument, which seeks to limit the exemption in section 2(b) to employers who could not comply with the new statutory minimum mandatory age of 70 without violating their collective bargaining agreements, would, taken to its limit, make the agreement terminate for purposes of section 2(b) as soon as the employer could change the provision setting 65 as the normal retirement age. That would be November 1, 1978, since United could have issued the required section 6 notice far enough in advance of that date to make the cooling-off period that the Act imposes to prevent strikes expire by then. But we cannot get any such meaning out of section 2(b). Congress dealt with the problem of employers' trying to get around the 1978 amendments through collective bargaining agreements of indefinite duration by confining the protection of section 2(b) to agreements entered into well before the effective date of the amendments and by setting an outside limit of January 1, 1980, which was little more than a year after the earliest possible date of expiration of United's agreement with the union.

■ The Commission does not push the logic of its argument to the limit, perhaps recognizing that, so pushed, it would require an employer to risk precipitating a labor dispute just to make the age 70 minimum mandatory retirement provision of the 1978 amendments applicable a few months earlier. The Commission is content to argue that the agreement expired on January 28, 1979, when United, having exhausted the various "cooling off" procedures that the Railway Labor Act prescribes, was free to put into effect any changes that it had announced in its section 6 notice. But the argument for that expiration date contains the same fallacy as would an argument for November 1, 1978. The end of the cooling-off period does not terminate the collective bargaining agreement any more than the formal expiration date in the agreement does; it just allows the employer to make the changes proposed in the section 6 notice. We find too metaphysical for our taste the argument that the agreement terminates on the date specified in the contract even though the employer cannot on termination make any changes. What he cannot change, after all, is the terms of the contract; realistically he continues subject to it, notwithstanding the arrival of the "termination" date; realistically, the contract remains in force.

■ The district judge thought the agreement expired when the union went out on strike on March 31. He thought that if, in an industry not subject to the Railway Labor Act, a union, not provoked by an unfair labor practice or contract breach by the employer, calls a strike, the employer is entitled to terminate his collective bargaining contract with the union, and if he exercises this right of termination the contract is at an end. We find no authority for this proposition, though maybe it could be teased out of the general contract doctrine of conditions, on which see our recent discussion in *Casio, Inc. v. S.M. & R. Co.*, 755 F.2d 528, 532–33 (7th Cir.1985). But we need not proceed any fur-

ther down this byway. Even if the employer could terminate the contract, he would not have to; and if he did not, we would be hard pressed to understand why his statutory rights should be cut down because the union had violated his contract rights. In any event, in industries subject to the Railway Labor Act a strike does not allow the employer to terminate the collective bargaining contract. In *Brotherhood of Railway & Steamship Clerks v. Florida East Coast Ry.*, 384 U.S. 238, 86 S.Ct. 1420, 16 L.Ed.2d 501 (1966), a union of railway workers went out on strike and the railroad hired replacement workers in violation of the collective bargaining agreement. The railroad argued that the strike entitled it to terminate the agreement. The Supreme Court rejected the argument. The employer might issue a section 6 notice on a relatively narrow matter so that if the parties were unable to resolve it through negotiation or mediation and a strike ensued the employer would be free to walk away from the entire contract. This the Court thought would be contrary to the basic purpose of the Railway Labor Act, which is to reduce the frequency of strikes by creating procedures for the amicable settlement of labor disputes. See, e.g., *Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369, 378, 89 S.Ct. 1109, 1115, 22 L.Ed.2d 344 (1969); *Texas & New Orleans R.R. v. Brotherhood of Railway & Steamship Clerks*, 281 U.S. 548, 562–68, 50 S.Ct. 427, 431–33, 74 L.Ed. 1034 (1930). Transportation strikes are more disruptive than strikes in manufacturing. Manufacturers can produce for inventory; producers of transportation services can't.

The logic of the *Florida East Coast Ry.* case seems applicable to this case. Forget about the Age Discrimination in Employment Act and suppose (however improbably in light of our earlier discussion) that United had decided to raise its normal retirement age to 70 and to spring this change on the union, which it thought might resist the change. (One effect of raising a mandatory retirement age is to reduce the number of workers employed during a span of time, since each worker can if he wants work longer.) And suppose that to accomplish this end United issued a section 6 notice that was studiously silent on the issue of retirement age, and then when the union went out on strike over the issues flagged by the notice United unilaterally instituted the new mandatory retirement age. This is the kind of thing that the Supreme Court has said the Railway Labor Act does not permit, see *Brotherhood of Railway & Steamship Clerks v. Florida East Coast Ry., supra,* 384 U.S. at 247, 86 S.Ct. at 1425, and that the Commission says is required by the Age Discrimination in Employment Act. We can find no evidence that Congress when it enacted section 2(b) of the 1978 amendments meant to throw such a monkey wrench into the machinery set up by the Railway Labor Act.

The Commission argues however that there is a crucial factual difference between the collective bargaining agreements in the *Florida East Coast Ry.* case and in this case: there was no termination date in the collective bargaining agreement in that case, corresponding to the November 1, 1978, date in this one. In *International Ass'n of Machinists v. Reeve Aleutian Airways, Inc.,* 469 F.2d 990, 993 (9th Cir. 1972), the Ninth Circuit distinguished *Florida East Coast Ry.* on this ground, and its decision has been cited approvingly in some later cases, notably *International Ass'n of Machinists v. Northeast Airlines, Inc.,* 536 F.2d 975, 978 n. 2 (1st Cir.1976) (dictum). Read together with *Florida East Coast Ry.,* the *Reeve Aleutian Airways* case produces this paradox: if the parties do not specify a termination date, so that the contract is terminable at will (subject of course to the "cooling off" provisions of the Railway Labor Act), the union has more protection against the employer's unilaterally revising the terms of employment than if the contract has an explicit ten-year term. A more plausible interpretation is that the specification of an expiration date bars the employer from issuing a section 6 notice intended to take effect before then. But passing this point, and assuming without having to decide that *Reeve Aleutian Air-*

*ways* was correctly decided, we think it is distinguishable from this case. The contract there was by its terms to "continue in full force and effect until April 1, 1968, and shall renew itself without change until each succeeding April 1st thereafter, unless written notice of intended change is served in accordance with [section 6] by either party hereto at least sixty (60) days prior to April 1st in any year. . . ." 469 F.2d at 991. So the contract lapsed 60 days after timely notice was given. The contract here is to continue past November 1, 1978, but "thereafter shall be *subject* to change by service of" a section 6 notice (emphasis added). In other words, the service of the notice is the mode of amendment, implying that what is not sought to be changed continues in effect. November 1 really isn't a termination date at all; it is the date before which no changes can be made. There is a difference between providing that a contract shall lapse at a given date and that after that date it shall be subject to amendment in accordance with specified procedures.

We conclude that the collective bargaining agreement signed in 1975 remained in effect, so far as making age 65 the normal (and within the meaning of the Age Discrimination in Employment Act, mandatory) retirement age for United's ground employees, until replaced by a new agreement on May 24, 1979. Therefore none of the employees forced to retire were forced to retire in violation of the Act. The Commission's appeal must be denied and United's granted, and the district court directed to dismiss the complaint in its entirety.

So Ordered.