**TRANS WORLD AIRLINES, INC., Plaintiff,**

v.

**The INDEPENDENT FEDERATION OF FLIGHT ATTENDANTS, an unincorporated labor organization, Defendant.**

No. 86–6059–CV–SJ–6.

United States District Court,
W.D. Missouri,
St. Joseph Division.

Aug. 1, 1986.

Murray Gartner, Proskauer Rose Goetz & Mendelsohn, New York City and Paul E. Donnelly, Stinson, Mag & Fizzell, Kansas City, Mo., for plaintiff.

William A. Jolley, Doyle T. Pryor, Scott A. Raisher, Jolley, Walsh, Hager & Gordon, Kansas City, Mo., for defendant.

## MEMORANDUM AND ORDER

SACHS, District Judge.

Trans World Airlines (TWA) has filed suit to determine whether the union security clause in a collective bargaining agreement survives into the self-help period after an impasse in bargaining over other issues. The Flight Attendants' Union (IFFA) counterclaims for a ruling that Article 24, the union security clause, remains in force, including provisions for check-off of union dues and a requirement that new hires join the union. Both parties have moved for summary judgment and both agree the court is presented with an issue of law, based on undisputed facts. The motions were argued July 12, 1986.

The issue raises two questions: (1) Did Article 28, the duration provision of the contract, cause parts of the contract that were not the subject of bargaining to continue in effect, or did notice of certain intended changes trigger a total termination of the agreement? (2) If the contract provides for total termination upon impasse over proposals for limited changes, is such a duration provision lawful under the Railway Labor Act?

The arguments of the parties focus on the second question. It would ordinarily be more appropriate to consider first the narrower question, largely confined to the rather unusual language of this agreement, instead of dealing with a statutory question having major import to labor relations in the airline industry. Both questions are sufficiently difficult, however, to justify

reasoning in the alternative, and the parties emphasize the second question in their briefing and argument. The court will therefore consider the questions in reverse order, and will initially make the assumption that the contract provided for total termination of contract obligations upon any impasse in bargaining, and that a lawful impasse has occurred.[1]

## I

Forceful language in a Supreme Court opinion supports the IFFA contention that the Railway Labor Act contemplates (1) continuity in the relationships between employers and representatives of employees, and (2) the development of carefully crafted contractual provisions that will become almost permanent fixtures governing certain phases of the employer-employee relation. *Brotherhood of Railway & Steamship Clerks, Freight Handlers, Express & Station Employees v. Florida East Coast Railway*, 384 U.S. 238, 86 S.Ct. 1420, 16 L.Ed.2d 501 (1966) (*FEC*).

The controversy in the *FEC* case and in the present case centers on § 2 Seventh of the Act (45 U.S.C. § 152 Seventh) which provides that "no carrier ... shall change the rates of pay, rules, or working conditions of its employees, as a class, as embodied in agreements except in the manner prescribed in such agreements or in Section 6 of this Act." Section 6 (45 U.S.C. § 156) requires at least thirty days' written notice of intended changes in agreements, and thereafter a protracted negotiating period before the parties are released to make such changes or otherwise engage in self-help.

Although an air or rail carrier may, after impasse in bargaining over proposed changes and release from further bargaining duties by the National Mediation

---

1. In companion litigation, IFFA contends TWA did not bargain in good faith and had no right to engage in self-help (reduction of wages of flight attendants, etc.). That litigation remains at the discovery stage, and is not ready for trial. The court has previously denied a temporary restraining order against TWA's exercise of self-help. All parties are content that, for present purposes, I treat the impasse as a lawful one, as I did in ruling the motion for a restraining order.

Board, face a strike and may continue its operations with a substantially different labor force, the Court declared in *FEC*:

Any power to change or revise the basic collective agreement must be closely confined and supervised. These collective bargaining agreements are the product of years of struggle and negotiation; they represent the rules governing the community of striking employees and the carrier. That community is not destroyed by the strike, as the strike represents only an interruption in the continuity of the relationship. Were a strike to be the occasion for a carrier to tear up and annul, so to speak, the entire collective bargaining agreement, labor-management relations would revert to the jungle. A carrier could then use the occasion of a strike over a simple wage and hour dispute to make sweeping changes in its work-rules so as to permit operation on terms which could not conceivably have been obtained through negotiation. Having made such changes, a carrier might well have little incentive to reach a settlement of the dispute that led to the strike. It might indeed have strong reason to prolong the strike and even break the union. The temptation might be strong to precipitate a strike in order to permit the carrier to abrogate the entire collective bargaining agreement on terms most favorable to it. The processes of bargaining and mediation called for by the Act would indeed become a sham if a carrier could unilaterally achieve what the Act requires be done by the other orderly procedures.

384 U.S. at 246–47, 86 S.Ct. at 1424–25.

The opinion of Justice Douglas continued: "While the carrier has the duty to make all reasonable efforts to continue its operations during a strike, its power to make new terms and conditions governing the new labor force is strictly confined, if the spirit of the Railway Labor Act is to be honored." 384 U.S. at 247, 86 S.Ct. at 1425. In footnote 7, the Court observed that a temporary deviation from the agreement during a strike might be authorized as to changes sought during negotiation or permitted by a district court as being essential to operations, but at the conclusion of the strike (presumably by agreement) "the terms of the earlier collective bargaining agreement, except as modified by any new agreement of the parties, would be fully in force." *Id.*

No member of the Court disagreed with this language, but Justice White dissented from the conclusion that a district court could authorize changes in the agreement during the strike, where such changes had not been the subject of bargaining. 384 U.S. at 249, 86 S.Ct. at 1426. He described the Court's ruling as one construing § 2 Seventh as forbidding the carrier "to make any changes in the contract other than those on which bargaining has taken place ..." *Id.*

TWA offers two rationales for distinguishing *FEC*. First, it contends the *FEC* ruling itself simply deals with the district courts' power, during a strike, to approve a change in collective bargaining provisions not addressed at the negotiating table. The message to those courts to impose a high burden on a carrier seeking approval of contemplated changes during the impasse period seems to have been only a subordinate theme in the opinion. It is difficult to avoid the conclusion that the principal message of the decision is that a carrier acting on its own is forbidden by law to make "changes in the contract other than those on which bargaining has taken place." 384 U.S. at 249, 86 S.Ct. at 1426 (White, J., dissenting).[2]

TWA's second rationale for distinguishing *FEC* centers on its observation that *FEC* involved a railroad collective bargaining agreement which had no expiration

---

**2.** The syllabus to the opinion identifies one of the holdings with the previously quoted language that "if the spirit of the Railway Labor Act is to be honored" a carrier's "power to make new terms and conditions governing [the re-placement] labor force [must be] strictly confined." While not the work of the Court, a syllabus is occasionally useful. *The Parent Association of Andrew Jackson High School v. Ambach,* 598 F.2d 705, 716 n. 9 (2d Cir.1979).

date, and was therefore a continuing contractual commitment subject to reopening of particular provisions. TWA contends there is implicit reference to the Court's understanding that the contract itself had not terminated, in that the Court repeatedly refers to "existing" agreements.

The Ninth Circuit seems to be the only appellate authority that has considered the ruling in *FEC* and nevertheless permitted what was deemed to be a termination clause to free a carrier from all provisions of a collective bargaining agreement after an impasse, including those which had not been the subject of a § 6 notice. *International Association of Machinists and Aerospace Workers v. Reeve Aleutian Airways, Inc.*, 469 F.2d 990 (9th Cir.1972), *aff'g* 330 F.Supp. 332 (D.Alaska 1971), *cert. denied*, 411 U.S. 982, 93 S.Ct. 2273, 36 L.Ed.2d 958 (1973). The *Reeve* ruling is rather summary, however, simply noting that *FEC* was distinguishable without considering its rationale. Nonetheless, this court might feel bound to follow *Reeve* as a controlling appellate precedent if it had not been questioned by another appellate court. See *EEOC v. United Air Lines*, 755 F.2d 94, 98 (7th Cir.1985) (Posner, J.). While I am not convinced that Judge Posner's criticism of *Reeve* is significantly more soundly

reasoned than the *Reeve* opinion itself,[3] the incipient conflict between the Seventh and Ninth Circuits, and the absence of Eighth Circuit appellate precedent, require that I undertake a more detailed analysis of the issue. I am not persuaded by TWA's contention that *Reeve* should be afforded controlling precedential effect because certiorari was denied.[4]

TWA concedes that it is baffled by *FEC*'s vigorous language regarding what the Act itself requires, but argues that it should be disregarded as dicta. The holding in *FEC* is admittedly concealed in strong language without an explicit statement of conclusions. It would have been quite simple, however, to avoid giving the eloquent lecture about the purposes of the Act if the Court had viewed the agreement between the parties as the controlling factor. Moreover, even if properly labelled as dicta, it is carefully considered dicta that a single trial judge should almost always treat as binding. That has been my practice, *Powell v. Kovac's, Inc.*, 596 F.Supp. 1520, 1524 (W.D.Mo.1984), and I believe it to be standard. *See, e.g., United States v. Kahn*, 251 F.Supp. 702, 708 (S.D.N.Y.1966). The pertinent language is not a casual remark or "very brief statement," but the major thrust of the *FEC* opinion. *Cf. An-*

---

**3.** Judge Posner concluded that any attempt to harmonize *FEC* and *Reeve* results in a paradox in that the contracts common to the railroad industry contain no termination date, and may therefore be terminated at will, but that under *FEC* such contracts would give the union greater protection than even a ten year fixed term contract as defined in *Reeve*. 755 F.2d at 98. My understanding of the railroad industry practice, however, is that the contracts are continuing agreements, with specific provisions modifiable pursuant to the Act, rather than terminable at will agreements. The common law principles to which Judge Posner refers yield to a different statutory intent. There is no paradox in concluding that a continuing agreement affords more protection than a fixed term agreement. The fact remains, however, that the Posner opinion senses an inconsistency between *Reeve* and the recited "logic" of *FEC*.

**4.** One rare indication that the Supreme Court recognizes that its denials of certiorari might legitimately be occasionally given some weight is in a case where the denial was flagged by

dissent. *United States v. Kras*, 409 U.S. 434, 443, 93 S.Ct. 631, 636–37, 34 L.Ed.2d 626 (1973). The conventional attitude almost invariably expressed is that of Justice Marshall in his *Kras* dissent. 409 U.S. at 461, 93 S.Ct. at 646. *See* Linzer, "The Meaning of Certiorari Denials," 79 Col.L.Rev. 1227 (1979). I decline to speculate that the reason for denial of certiorari in *Reeve* was agreement on the merits with that ruling. Docket conditions might have been a factor, or doubt that *Reeve* would become a significant precedent. While it looms large in this litigation, more than a dozen years passed before the courts began to find it necessary to compare it with *FEC*. During that period it seems to have been relied on in only one appellate decision, *IAM v. Northeast Airlines*, 536 F.2d 975, 978, n. 2 (1st Cir.), *cert. denied*, 429 U.S. 961, 97 S.Ct. 387, 50 L.Ed.2d 328 (1976), and TWA cites no law review treatment or other identification of the case as a significant limitation on the general policy favoring continuity in labor relations under the Railway Labor Act. The Court guessed correctly if it saw no urgency in dealing with *Reeve*.

heuser-Busch, Inc. v. Stroh Brewery Co., 750 F.2d 631, 636 (8th Cir.1984) (indicating that a casual remark in an opinion of another circuit may be unpersuasive).

With only slightly shifted emphasis, TWA contends that neither side in *FEC* even argued that the contract had expired, and that the entire opinion is therefore premised on an assumption of an underlying, existing contract. This contention may well be true, but it in no way undermines the binding nature of the Court's holdings with respect to the policies of the Act. Those policies are not altered by language in contracts which are necessarily subservient to it.

As stated in *FEC*, the Act seeks to foster a "community" between labor and management and to maintain contract provisions established after "years of struggle and negotiation." 384 U.S. at 246, 86 S.Ct. at 1424. Allowing the regulated parties to establish comprehensive termination dates in their contracts would seemingly flout these purposes. Such provisions would have a greater tendency to sever the community and destroy the long established contractual provisions than would normally be expected under the procedures of § 6. As a matter of statutory construction, the lesson of *FEC* appears to confine the parties to prescribing renegotiation provisions in their agreements under § 2 Seventh that are consistent with § 6 of the Act. The statutory right to provide alternate procedures by contract which are not identical with those provided in § 6 allows the parties to vary the notice periods and the like, but prevents them from lawfully causing

contracts to completely self-destruct simply upon notice of specified proposed changes.[5]

This reading of the implications of the *FEC* decision flows naturally from the language of the opinion, which is otherwise hard to explain. It is not novel with this court. In the only other pertinent decision from within the Eighth Circuit an identical reading of *FEC* occurred, in a thoughtful opinion by Judge Larson. *Cox v. Northwest Airlines, Inc.*, 319 F.Supp. 92 (D.Minn.1970). *See also ALPA v. United Air Lines*, 614 F.Supp. 1020, 1024 (N.D.Ill. 1985) (appeal pending) (residual provisions that were not renegotiated survive despite existence of a duration clause in the contract that is arguably a termination provision, 614 F.Supp. at 1041).[6] An appellate decision assuming the *FEC* decision applies in the airline industry in its permission for *limited* self-help is *ALPA v. C.A.B.*, 502 F.2d 453, 457 n. 12 (D.C.Cir.1974), *cert. denied*, 420 U.S. 972, 95 S.Ct. 1392, 43 L.Ed.2d 652 (1975).

TWA further contends that a rule requiring continuing contracts, under the doctrine of *FEC*, will conflict with normal practice in the airline industry. A source deserving of respect has noted that airline bargaining practices have developed differently from those that are customary among railroads. Burgoon, "Mediation Under the Railway Labor Act," a chapter in *The Railway Labor Act at Fifty*, (G.P.O.1977). In particular, it is said that airline contracts "are not continuing instruments. They expire in their entirety on the date set forth in the agreement."[7] *Id.* at 92. The Burgoon article lends some support to Justice Douglas' ruling in *FEC*, however, in its

---

**5.** While it is theoretically possible, under this interpretation of the Act, to serve notice that a party desires to change every provision of a contract, it may be assumed that this would be so unlikely and would present such difficulties that parties would rarely if ever adopt this technique. Such a notice might, moreover, place a party in jeopardy of being found not to be bargaining with a good faith intention to reach agreement.

**6.** It may be observed that although Judge Bua did not refer to the *EEOC* decision in his *ALPA* opinion, he was the district judge in that case.

When he applied *FEC* principles in *ALPA* to overcome contract language that was quite similar to that in *Reeve*, Judge Bua took the same path that I do in this portion of my ruling.

**7.** As will be discussed further, in the recent *EEOC* case Judge Posner noted one airline contract that has no such termination clause, and I find another in this case. The contract in *Reeve* was assumed to provide a termination date, but the language does not unmistakably prevent partial survival of contract terms.

discussion of the original intent and essential purpose of the Railway Labor Act. The author observes:

> Another among the railroad industry practices which influenced the provisions of the Railway Labor Act was that of negotiating open-end collective bargaining agreements. Railroad agreements do not expire on a given date but remain in effect until one party or the other proposes modification of certain of the agreement's provisions, whereupon negotiations take place on the specific issues raised and, when agreement is reached, the contract is modified accordingly. The earliest railroad agreements known, dating back to the last quarter of the 19th Century, were of this open-end type and the practice continues throughout the industry to the present time ... Section 6 of the Railway Labor Act provides for 'thirty days written notice of an intended change in agreements affecting rates of pay, rules or working conditions ...' thus accommodating to the open-end contracts.

*Id.* at 92. It seems, therefore, that Justice Douglas accurately caught the spirit of the Act in his *FEC* opinion. It may fairly be concluded that the right to make agreements prescribing the manner of changing contract terms, as set forth in § 2 Seventh, was intended to supplement rather than displace § 6, and cannot be construed to permit parties to "opt out" of the basic procedures of the Act. A termination provision avoiding renegotiation of undesired terms conflicts with the Act, as described in *FEC*, and has not been shown to have been within the contemplation of Congress when it enacted the language in question in 1934. Although Burgoon says such contracts demonstrate the "flexibility" of the Act, *Id.*, the Supreme Court ruling in *FEC* shows the practice to be inconsistent with

the basic mandates of §§ 2 Seventh and 6 of the legislation.

TWA has cited a number of cases that give effect to termination clauses in airline labor contracts. Several predate the Supreme Court ruling in *FEC* or are from the Ninth Circuit and its constituent districts, where one would expect the panel opinion in *Reeve* to prevail. The only airline cases that carefully consider the teaching in *FEC* are *Cox* and *EEOC*, both of which lend some support to my ruling here.

A final TWA contention is that it cannot collect dues for the union without an agreement with the union, and that the Railway Labor Act simply freezes certain rules and conditions of employment embodied in a prior agreement but does not extend the agreement. As stated in *EEOC*, however, "realistically, the contract remains in force." 755 F.2d at 99.

■ It is concluded that the duration clause of the TWA–IFFA contract, if construed as TWA urges, would violate the Railway Labor Act. The portions of the contract not subjected to renegotiation still exist. The union security clause remains presently binding on TWA since the only issue dealt with in bargaining was the use of the check-off during a strike.[8]

## II

In *EEOC v. United Air Lines, Inc.*, 755 F.2d 94 (7th Cir.1985), Judge Posner avoided a ruling flatly disapproving of the *Reeve* decision, 469 F.2d 993, by construing the duration clause in the airline contract before him as creating an amendable rather than a terminable contract. The language under consideration specified that the agreement "shall remain in full force and effect through November 1, 1978, and thereafter shall be subject to change by service of a notice as provided for in Section 6" of the Railway Labor Act. 755 F.2d

---

**8.** The parties will recognize that I express no view of the issues of public policy presented by this case. It is arguable that the airline industry's labor-relations legislation should be harmonized with the deregulation of the airline industry in other respects. *See IAM v. TWA*, 601 F.Supp. 1363, 1372 n. 11 (W.D.Mo.1985). Re-

moval of the industry from Railway Labor Act coverage and substitution of coverage by the National Labor Relations Act may well be appropriate. In the meantime, the present parties would be well advised to resume negotiating to put their mutilated collective bargaining agreement in order.

at 97. Although the district court had concluded that the contract had terminated in its entirety, the Seventh Circuit disagreed. The appellate ruling was that "the service of the notice is the mode of amendment, *implying* that what is not sought to be changed continues in effect. November 1 really is not a termination date at all; it is the date before which no changes can be made." *Id.* (Emphasis added.)

The present contract contains a duration clause providing:

> Except as otherwise specified in this Agreement, this entire Agreement shall be effective August 1, 1981 [and] shall remain in effect until July 31, 1984, and thereafter shall renew itself without change for yearly periods unless written notice of intended change is served in accordance with Section 6 ... of the Railway Labor Act by either party hereto, at least 90 days prior to the renewal date in each year.

This language shows that a *total* renewal occurs if no notice is received. As in *EEOC*, there is no express language terminating the agreement in the event of a notice of intended change. While the notice prevents total renewal, nothing in the wording prevents partial renewal. On the contrary, partial renewal seems implied in the language preventing renewal of the "entire" agreement.[9] The reference to the "entire" contract is useless, by the TWA interpretation, and merely serves as emphasis. It is more likely that it has an operative purpose, distinguishing between all or parts of the agreement. The language appears to create an amendable contract, as in *EEOC*, with prospective changes limited to the subject matter of the notice.

Under the National Labor Relations Act, contractual provisions authorizing notices seeking modifications of contracts have sometimes been deemed to cause terminations and have sometimes been treated as authority for amendments only. *Kaufman and Broad Home Systems, Inc. v. Intern. Broth. of Firemen and Oilers,* 607 F.2d 1104 (5th Cir.1979). Consistent with the policies of the Railway Labor Act, as enunciated in *FEC*, the contract at bar should be read harmoniously with that Act so as to create continuing obligations, except as changed in accordance with § 6 or with supplemental agreements refining the prescribed procedures.

If extrinsic evidence is admissible or helpful, IFFA has supplied it. The chief legal counsel of IFFA, who has served in that capacity for more than nine years, stated by affidavit that TWA officials have never prior to this controversy referred to any "expiration date" of their collective bargaining agreements, or spoken in terms of the contracts "expiring" or "terminating." Such officials and representatives did, however, refer to "amendable dates" and referred to the agreements as "becoming amendable." Affidavit of William A. Jolley, July 2, 1986, page 2. No contrary evidence has been offered.

■ The contract in question is amendable in accordance with its provisions and the Railway Labor Act. It does not wholly terminate, either automatically or upon service of notice of a limited number of intended changes. The union security provision continues in effect, under the circumstances presented by the cross motions for summary judgment. It is therefore

ORDERED that plaintiff's motion for summary judgment be DENIED and defendant's motion for summary judgment be GRANTED. The Clerk shall enter judgment in favor of defendant.

Plaintiff shall implement the check-off provision of Article 24 within fourteen (14) days of this date, and shall implement the union membership provision within thirty (30) days of this date. If notice of appeal is

---

**9.** While pleaders are often relieved from careless, unintended negative pregnants (2A *Moore's Federal Practice* § 8.24), one would suppose that the parties adopting language designed for long-term use can generally be held more precisely to what they say and the implications of what they refrain from saying. This is not the kind of clause where the parties are likely to have planted intentional ambiguities in order to paper over differences.

filed, no stay pending appeal will issue from this court.

The court retains jurisdiction to modify or enforce this order.