**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED TRANSPORTATION UNION,
Plaintiff-Appellee,

v.

SOUTH CAROLINA PUBLIC RAILWAY
COMMISSION,
Defendant-Appellant.

No. 97-1418

Appeal from the United States District Court
for the District of South Carolina, at Charleston.
Patrick Michael Duffy, District Judge.
(CA-96-2501-2-23)

Argued: October 3, 1997

Decided: December 4, 1997

Before NIEMEYER and HAMILTON, Circuit Judges, and
BOYLE, Chief United States District Judge for the
Eastern District of North Carolina, sitting by designation.

_____

Vacated and remanded by published opinion. Judge Hamilton wrote
the opinion, in which Judge Niemeyer and Chief Judge Boyle joined.

_____

**COUNSEL**

**ARGUED:** Clinton Joseph Miller, III, General Counsel, UNITED
TRANSPORTATION UNION, Cleveland, Ohio, for Appellee. **ON
BRIEF:** Keating Lewis Simons, III, Derek Farrell Dean, LAW
OFFICES OF KEATING L. SIMONS, III, Charleston, South Caro-
lina, for Appellant.

**OPINION**

HAMILTON, Circuit Judge:

Under the Railway Labor Act (RLA), 45 U.S.C. §§ 151-188, federal district courts have subject-matter jurisdiction over "major disputes" in railway labor relations, but lack jurisdiction over "minor disputes." See Consolidated Rail Corp. v. Railway Labor Executives' Ass'n, 491 U.S. 299, 303-04 (1989). Instead, minor disputes are subject to mandatory arbitration before the National Railroad Adjustment Board. See id. See also 45 U.S.C. § 153. Generally, when a party to a labor dispute is seeking to create contractual rights, the dispute is a major dispute; however, if the parties are merely seeking to enforce contractual rights, the dispute is minor. See Consolidated Rail, 491 U.S. at 302.

In this case, the South Carolina Public Railway Commission (Railway Commission) asserts that the district court lacked subject-matter jurisdiction to issue a preliminary injunction requiring the Railway Commission to pay rate-of-pay increases, lump sum payments, and health and welfare adjustments contained in a national collective bargaining agreement, because its dispute with the United Transportation Union (the Union) is a minor one. We agree with the Railway Commission that its dispute with the Union is fundamentally a dispute seeking to enforce contractual rights and is, therefore, a minor dispute under the RLA. Consequently, we vacate the preliminary injunction and remand the case with instructions to dismiss for lack of subject-matter jurisdiction.

I.

A.

Collective bargaining in the railroad industry is conducted on both the national and local levels. Local collective bargaining involves negotiations between a single employer and an individual union, whereas national collective bargaining (commonly referred to as "national handling") involves multiple employers and multiple unions. Unions and employers typically participate in national bargaining by

2

conferring their bargaining authority to multi-union and multi-carrier bargaining agents. These agents then negotiate a single national agreement which is binding on all the parties. See United Transp. Union v. Illinois Cent. R.R. Co., 731 F. Supp. 1332, 1333 (N.D. Ill. 1990).

Collective bargaining in the railroad industry, on both the national and local levels, is covered by the RLA, 45 U.S.C.§ 151-188. In Detroit & Toledo Shore Line R.R. v. United Transp. Union, 396 U.S. 142 (1969), the Supreme Court explained the objectives of the RLA:

> The Railway Labor Act was passed in 1926 to encourage collective bargaining by railroads and their employees in order to prevent, if possible, wasteful strikes and interruptions of interstate commerce. The problem of strikes was considered to be particularly acute in the area of"major disputes," those disputes involving the formation of collective agreements and efforts to change them. Rather than rely upon compulsory arbitration, to which both sides were bitterly opposed, the railroad and union representatives who drafted the Act chose to leave the settlement of major disputes entirely to the processes of noncompulsory adjustment. To this end, the Act established rather elaborate machinery for negotiation, mediation, voluntary arbitration, and conciliation. It imposed upon the parties an obligation to make every reasonable effort to negotiate a settlement and to refrain from altering the status quo by resorting to self-help while the Act's remedies were being exhausted.

Id. at 148-49 (internal quotations and citations omitted).

Another railroad-industry practice that influenced the RLA was that of negotiating open-ended agreements. Railroad collective bargaining agreements do not expire on a given date but remain in effect until one party proposes modifications of the agreement, whereupon a new round of negotiations takes place. When the parties conclude an agreement on those issues, the contract is modified accordingly. See Trans World Airlines v. Independent Fed'n of Flight Attendants, 640 F. Supp. 1108, 1113 (W.D. Mo. 1986), aff'd , 809 F.2d 483 (8th Cir. 1987), aff'd, 485 U.S. 175 (1988) (quoting Beatrice M. Burgoon,

3

"Mediation Under the Railway Labor Act," in <u>The Railway Labor Act at Fifty</u>, 71, 92 (1977)). This procedure of proposing and negotiating contract modifications is incorporated into Section 6 of the RLA, 45 U.S.C. § 156.

Section 6 requires employers and unions to give the other party a 30-day notice of proposed changes in agreements affecting rates of pay, rules, or working conditions. <u>See id.</u> The filing of a Section 6 notice commences a period of mandatory negotiation, during which the existing rates of pay, rules and working conditions generally may not be altered until the controversy is resolved. <u>See id.</u> If the parties cannot agree between themselves, the negotiations then go to mediation, usually under the auspices of the National Mediation Board. <u>See</u> 45 U.S.C. § 155. Sometimes, it becomes necessary for the President to appoint an Emergency Board to make a report and recommendations to resolve the dispute. <u>See</u> 45 U.S.C.§ 160. <u>See also Detroit & Toledo Shore Line</u>, 396 U.S. at 145, 150-51.

In summary, neither party may change the <u>status quo</u> with respect to existing agreements without first filing a Section 6 notice, and must maintain the <u>status quo</u> until the collective bargaining process is complete. <u>See Detroit & Toledo Shore Line</u>, 396 U.S. at 150. The goal of this scheme is to prevent the unilateral imposition of new contractual terms. <u>See Consolidated Rail</u>, 491 U.S. at 306. It "delay[s] the time when the parties can resort to self-help[,] provides time for tempers to cool, helps create an atmosphere in which rational bargaining can occur, and permits the forces of public opinion to be mobilized in favor of a settlement without a strike or lockout." <u>Detroit & Toledo Shore Line</u>, 396 U.S. at 150.

B.

The Railway Commission is an agency of the State of South Carolina which operates a railroad that transports goods in interstate commerce. The Railway Commission is therefore a rail"carrier" as defined by the RLA. <u>See</u> 45 U.S.C. § 151 First. The Union is an unincorporated labor organization which represents railroad employees throughout the United States and Canada. Consequently, the Union is a "representative" under the RLA. <u>See</u> 45 U.S.C. § 151 Sixth. The Union represents employees of the Railway Commission.

4

On July 2, 1973, the Union and Railway Commission completed a round of local collective bargaining and signed into effect an "Agreement Between The South Carolina Public Railways [sic] Commission and its Yard Employees Represented by United Transportation Union" (the 1973 Agreement). (J.A. 24). Article 42 provides that the agreement would "become effective as of July 2, 1973 and remain in effect until changed in accordance with the provisions of the Railway Labor Act, amended." (J.A. 27). Two other provisions of that agreement are in dispute in this case:

> Article 1. Rates of pay:
>
> (a) Rates of pay will be governed by those agreed upon by the national agreement.
>
> . . . .
>
> Article 34. Health and welfare:
>
> (a) The national Health and Welfare Agreement consummated between the Carriers Conference Committee and the United Transportation Union, subject to any extensions or modifications by constituted authority of the United Transportation Union, is part of this agreement.

(J.A. 25-26).

The two national agreements which Articles 1(a) and 34(a) incorporate had been previously negotiated and were in force at the time the 1973 Agreement was enacted. However, in January 1977, August 1977, February 1981, and July 1988, the Union triggered new rounds of national handling by serving Section 6 notices on"practically all railroads in the United States," which notices expressed a desire to change existing agreements. (See J.A. 28-31). In each instance, the Railway Commission chose not to participate in the national handling. Instead, the Railway Commission and the Union enacted local "standby agreements" that adopted the terms of the national agreements when they were finalized.[1] All these standby agreements are essentially identical in wording, and provide in their entirety:

_____

[1] In 1988, the Railway Commission first declined to enter into a standby agreement with the Union, wishing instead to negotiate locally

5

> In accordance with provisions of the Railway Labor Act, as amended, a notice was served under date of [date differed for each standby agreement], on practically all rail-roads in the United States, including [the South Carolina Public Railway Commission], by the accredited representative of employees of such railroads who are represented by the United Transportation Union, of a desire to change existing agreements as set forth in an attachment made part of the aforesaid notice.
>
> The management of [the South Carolina Public Railway Commission] has not authorized and will not authorize any of the conference committees selected by the railroads to represent it in the handling of these matters. <u>Therefore, it is hereby agreed between the SC Public Railways Comm. Railroad and the accredited representative of the employees involved, signatories hereto, that any settlement or disposition of these matters reached through national handling shall be adopted and applied by the said SC Public Railways Comm. Railroad and the employees involved in the same manner and made effective as of the same date as it is adopted and applied on the railroads, parties to such national handling.</u>

(J.A. 31) (emphasis added). In each case, when the Union served its Section 6 notices on the Railway Commission regarding the national handling, the Union enclosed a proposed standby agreement.

When the contract moratorium covered by the 1988 Standby Agreement expired in 1995, the Union and the Railway Commission served Section 6 notices on each other, requesting changes in various aspects of compensation and working conditions. In its notice, the Railway Commission stated it would not enter into another standby

_____

rather than accept the national agreement. The Railway Commission later changed its mind and entered into a standby agreement on August 9, 1988. The 1988 Standby Agreement incorporated the national agreement that was finally completed in 1991.

6

agreement as it had previously. Instead, the Railway Commission preferred to negotiate wage and benefits locally.

On May 8, 1996, a new national agreement was finalized. As in the case of all previous national handling, the Railway Commission was not a party to the national agreement. In a letter dated May 22, 1996, the Union requested that, pursuant to Articles 1(a) and 34(a) of the 1973 Agreement, the Railway Commission implement the rates of pay, lump-sum payments and health and welfare benefits contained in the 1996 national agreement. On June 11, 1996, the Railway Commission responded that the existing rates of pay would remain unchanged. The Railway Commission stated that its 1995 Section 6 notice served notice upon the Union that the compensation elements were to be negotiated, and that the Railway Commission had not agreed to be bound by the national agreement. After an additional exchange of correspondence between the parties, the Union brought this action seeking declaratory and injunctive relief under the RLA to force the Railway Commission to apply the pay, health and welfare provisions of the 1996 national agreement.

In the district court, the Union moved for a preliminary status quo injunction against the Railway Commission, and the Railway Commission moved to dismiss. The Railway Commission argued that the dispute was a "minor dispute" under the RLA and subject to mandatory arbitration. Accordingly, the Railway Commission argued that the district court lacked subject-matter jurisdiction to hear the dispute. See Consolidated Rail, 491 U.S. at 303-04.

In considering the parties' motions, the district court assessed whether the dispute was a "major dispute" or"minor dispute" under the RLA. The district court rejected the Railway Commission's suggestion that the parties' "past practice" of entering into standby agreements was evidence that the 1973 Agreement was not intended to incorporate the terms of all future national agreements. Instead, the district court found the 1973 Agreement to unambiguously adopt the terms of all national agreements. The district court concluded that the Railway Commission's position was "not arguable" and, therefore, the dispute was a "major dispute." See id. at 305-07. The district court therefore granted the Union's motion to preliminarily enjoin the Railway Commission from refusing to pay the rate of pay increases and

7

other adjustments contained in the 1996 national agreement. The Railway Commission appealed that order to this court. **2**

II.

A.

We review the grant of a preliminary injunction for abuse of discretion. See Manning v. Hunt, 119 F.3d 254, 263 (4th Cir. 1997). However, a district court's action that is based on an error of law is a per se abuse of discretion. See United States v. McHan, 101 F.3d 1027, 1040 (4th Cir. 1996) (citing Koon v. United States, 116 S. Ct. 2035, 2047 (1996)), cert. denied, 117 S. Ct. 2468 (1997). Whether a dispute is "major" or "minor" under the RLA is a question of law which we review de novo. See CSX Transp., Inc. v. United Transp. Union, 879 F.2d 990, 995 (2d Cir. 1989); International Ass'n of Machinists v. Soo Line R.R., 850 F.2d 368, 374 (8th Cir. 1988) (en banc). Moreover, we review the exercise of subject matter jurisdiction de novo. See Ahmed v. United States, 30 F.3d 514, 516 (4th Cir. 1994).

B.

The key question at issue in this appeal is whether the parties' dispute is "major" or "minor" under the RLA. The answer to this question determines whether the district court had subject-matter jurisdiction to hear the case. See Consolidated Rail, 491 U.S. at 303-04 (stating that the National Railroad Adjustment Board has exclusive jurisdiction to review minor disputes) (citing 45 U.S.C. § 153 First). Because we conclude that the dispute is a minor one under the RLA, we hold that the district court lacked subject-matter jurisdiction to issue the preliminary injunction.

The RLA does not explicitly use the terms "major dispute" or "minor dispute." Rather, these are terms adopted by the courts from the vocabulary of railroad management and labor as a shorthand

_____

**2** At oral argument, we granted the Railway Commission's motion for a stay of the district court's injunction pending the outcome of this appeal.

8

method of describing two classes of controversies Congress had distinguished in the RLA. As we will explain more fully below, "major disputes" seek to create contractual rights, while "minor disputes" seek to enforce those rights. See id. at 302.

The statutory basis of the major dispute category is found in § 2 Seventh and § 6 of the RLA, 45 U.S.C. § 152 Seventh and § 156. The former states that "No carrier, its officers or agents shall change the rates of pay, rules, or working conditions of its employees, as a class as embodied in agreements except in the manner prescribed in such agreements" or through the mediation procedures established in RLA § 6. See Consolidated Rail, 491 U.S. at 302. When a major dispute arises, the RLA requires the parties to undergo a lengthy process of bargaining and mediation. 45 U.S.C. §§ 155 and 156. Until they have exhausted those procedures, the parties are obligated to maintain the status quo, and the district courts have subject-matter jurisdiction to enjoin a violation of the status quo pending the outcome of the procedures. See Consolidated Rail, 491 U.S. at 302-03.

Minor disputes, on the other hand, are based on RLA§ 2 Sixth and § 3 First (i), 45 U.S.C. §§ 152 Sixth and 153 First (i). These sections establish conference and compulsory arbitration procedures for disputes arising out of "grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions." Id. § 152 Sixth. See Consolidated Rail, 491 U.S. at 303. See also Hawaiian Airlines, Inc. v. Norris, 512 U.S. 246, 254-55 (1994) (holding that "grievances" is merely a synonym for disputes involving the interpretation or application of collective bargaining agreements). When a minor dispute arises, it is subject to compulsory and binding arbitration, and the jurisdiction of the National Railroad Adjustment Board is exclusive. See 45 U.S.C.§ 153. See also Consolidated Rail, 491 U.S. at 303-04. As a consequence, district courts lack subject-matter jurisdiction over minor disputes. See id.

The difficulty is, of course, determining whether any given dispute is a major or minor one. In Consolidated Rail , the Supreme Court addressed the standard for differentiating between the two, see id. at 300, explaining that major disputes are

> disputes over the formation of collective agreements or efforts to secure them. They arise where there is no such

9

agreement or where it is sought to change the terms of one, and therefore the issue is not whether an existing agreement controls the controversy. They look to the acquisition of rights for the future, not to assertion of rights claimed to have vested in the past.

Id. at 302 (quoting Elgin, Joliet & E. Ry. Co. v. Burley, 325 U.S. 711, 723 (1945)) (emphasis added). Minor disputes, on the other hand,

contemplate[ ] the existence of a collective agreement already concluded or, at any rate, a situation in which no effort is made to bring about a formal change in terms or to create a new one. The dispute relates either to the meaning or proper application of a particular provision . . . or to an omitted case. . . . In either case the claim is to rights accrued, not merely to have new ones created for the future.

Id. at 303 (quoting Burley, 325 U.S. at 723) (emphasis added).

The Supreme Court concluded that the demarcation between major and minor disputes is, therefore, neither the importance of the issue nor the likelihood one party would resort to self-help. Instead, the line drawn is whether one of the parties asserts that the terms of an existing agreement either establishes or refutes the presence of a right to take the disputed action. "The distinguishing feature of such a case is that the dispute may be conclusively resolved by interpreting the existing agreement." Id. at 305 (emphasis added). In other words, "major disputes seek to create contractual rights, [while] minor disputes [seek] to enforce them." Id. at 302.

The test the Supreme Court therefore creates in Consolidated Rail is that "[w]here [a party] asserts a contractual right to take the contested action, the ensuing dispute is minor . . . ." Id. at 307. However, to prevent that party's characterization of the dispute from undercutting the RLA's prohibition against unilateral imposition of contractual terms, the Supreme Court added that the party's action must be "arguably justified by the terms of the parties' collective-bargaining agreement. Where, in contrast, the employer's claims are frivolous or obviously insubstantial, the dispute is major." Id. at 305-07.

10

The Supreme Court stated that the railroad has the burden of establishing the exclusive arbitral jurisdiction under the RLA (and, consequently, the lack of jurisdiction in the district court), but added that the railroad's burden is "relatively light." Id. at 307. Relying on this light burden and the language of the test, this court has concluded that the Consolidated Rail test is "deliberately tilted toward finding a dispute minor." Railway Labor Executives Ass'n v. Chesapeake W. Ry., 915 F.2d 116, 119 (4th Cir. 1990). Moreover,

> [a] district court need not, indeed should not, assess the relative merits of the parties' competing interpretations of the contract in order to find the dispute "minor." If the railroad's assertion that the collective bargaining agreement controls the dispute rises above the "frivolous or obviously insubstantial," then the court must dismiss the action for lack of subject matter jurisdiction.

Id. Finally, as the Supreme Court noted in Consolidated Rail, although the union's interpretation could conceivably carry the day in arbitration, that does not mean that the railroad's contractual interpretation is frivolous or insubstantial. See Consolidated Rail, 491 U.S. at 317.

C.

Applying the above rules to the facts of this case, we must decide whether the Railway Commission's position is "arguably justified by the terms of the parties' collective-bargaining agreement" or, rather, "frivolous or obviously insubstantial." See Consolidated Rail, 491 U.S. at 305-07. The Railway Commission is, of course, trying to characterize the dispute as minor, to avoid the imposition of the injunction. The Railway Commission asserts that the dispute turns on the interpretation of the 1973 Agreement, particularly in light of the parties' "past practice" of enacting standby agreements. The Union, on the other hand, is trying to characterize the dispute as major, by asserting it is about adding new terms (those of the new national agreement) to the 1973 Agreement. At first blush, the Union's characterization appears to have merit: if the Union's interpretation of the 1973 Agreement prevails, the terms of the 1996 national agreement would be added to the parties' 1973 Agreement. Thus, the dispute

11

may appear to be about the creation of contractual rights and, therefore, may appear to be major. However, on more careful examination, it becomes clear that such a result is necessarily founded on the interpretation of the 1973 Agreement. Indeed, the crux of the Union's position is that the 1973 Agreement incorporates the compensation, health and welfare benefits of all future national agreements. Thus, the Union is, in reality, seeking to enforce the 1973 Agreement.[3]

The Consolidated Rail Court held that "[t]he distinguishing feature of [a minor dispute] is that the dispute may be conclusively resolved by interpreting the existing agreement." Id. at 305. Such is the case here. The obligations and benefits of the parties cannot be determined without first determining whether the parties incorporated all national agreements into the 1973 Agreement. Incidentally, this determination would also determine what the status quo currently is. If the 1973 Agreement is interpreted for the Railway Commission, then the Railway Commission has no duty to provide the new wage and health benefits. If, however, the 1973 Agreement is interpreted for the Union, the benefits from the 1996 national agreement would already be a part of the 1973 Agreement. In either case, no formal changes in the existing 1973 Agreement would be required. See id. at 303 (stating that minor disputes involve no efforts to bring about a formal change in an agreement or to create a new one).

_____

[3] Counsel for the Union admitted at oral argument they are seeking to enforce the existing contract, not to form a new agreement. However, counsel still characterized the case as a major dispute because the Union was seeking to maintain the status quo. In so arguing, counsel cited to the Supreme Court's decision in Detroit & Toledo Shore Line, 396 U.S. 142.

The Union's argument merely begs the question. If the dispute is a major dispute, then the parties are obligated to"preserve and maintain unchanged those actual, objective working conditions and practices, broadly conceived, which were in effect prior to the time the pending dispute arose and which are involved in or related to that dispute." See id. at 153. However, the Supreme Court has never recognized the obligation to maintain the status quo during a minor dispute. See Consolidated Rail, 491 U.S. at 304. Thus, "maintaining the status quo" has no meaning until the dispute has been classified as major or minor.

12

In reality, the district court's decision turned entirely on the interpretation of the 1973 Agreement and standby agreements. The district court examined the provisions of all these local agreements and the parties' alleged past practices, and found that the Railway Commission's interpretation was not arguable. Consequently, the district court concluded that the Railway Commission was attempting to unilaterally alter the terms of the 1973 Agreement, constituting a major dispute. This demonstrates that even the district court implicitly recognized that this dispute was fundamentally about contract interpretation. However, we believe the district court erred in concluding the Railway Commission's interpretation was not arguable.

Examining the facts of this case, we believe the Railway Commission's position is "arguably justifiable" in light of the 1973 Agreement and the standby agreements and, therefore, the Railway Commission has met its light burden of establishing exclusive arbitral jurisdiction. See id. at 307. First, the 1973 Agreement was entered into at a time when a national agreement was already in existence, and the 1973 Agreement refers to "the national agreement." (J.A. 25). Moreover, every standby agreement was entered into at a time when a national agreement was being negotiated, and each states that "any settlement . . . reached through national handling shall be adopted [by the Railway Commission and Union]." (J.A. 28-31). It is reasonable to assume the parties to these local agreements knew that the national agreement under consideration at the time would not be the last; future rounds of national handling would be inevitable. Therefore, the natural inclination, if the parties meant to incorporate all future national agreements in the 1973 Agreement, would have been to refer to "national agreements."[4] Likewise, in the standby agreements, the parties would have been naturally inclined to state that "all settlements . . . reached through national handling will be adopted" by the parties. (Compare J.A. 28-31). Instead, because there was a partic-

_____

[4] In other words, we believe the parties would have more naturally stated in Article 1(a) of 1973 Agreement words to the effect that "Rates of pay will be governed by those agreed upon by national agreements." (Compare J.A. 25). Furthermore, in Article 34(a) the parties would have naturally stated that "National Health and Welfare Agreements to be consummated between the [parties] . . . are a part of this agreement." (Compare J.A. 26).

13

ular national agreement in contemplation by the parties, their natural inclination was to state "the national agreement" and imply that particular agreement. See Consolidated Rail, 491 U.S. at 311 (stating that collective-bargaining agreements may include implied, as well as express, terms). The district court should have considered the implied meaning of "the national agreement" in context with the history of the 1973 Agreement and the standby agreements.

However, in response to questions at oral argument, counsel for the Union maintained it was entirely proper for the 1973 Agreement to refer to the national agreement. Counsel argued that, since collective bargaining agreements under the RLA never expire but are modified only after Section 6 notice and negotiations, there is in reality only one national agreement. Although this argument could conceivably carry the day in arbitration, it only serves to further emphasize that the parties dispute the meaning of the 1973 Agreement. It does not, however, do anything to convince us that it is "frivolous or obviously insubstantial" for the Railway Commission to interpret "the national agreement" as being a particular agreement in effect or under consideration at the time. See id. at 317 (stating that although the union's interpretation could conceivably carry the day in arbitration, that does not mean that the railroad's contractual interpretation is frivolous or insubstantial).

Moreover, the record clearly shows that the parties used standby agreements for every subsequent round of national handling. If the 1973 Agreement truly incorporates all future national agreements, each of these standby agreements would be superfluous. If, on the other hand, the 1973 Agreement only incorporated the national agreement in effect at the time, each subsequent standby agreement would have been necessary in order to adopt subsequent national agreements. The record clearly shows it was the Union that instigated adoption of each standby agreement. Although not determinative, these facts are evidence that the parties' past practice was to incorporate new national agreements only through standby agreements, rather than automatic incorporation into the 1973 Agreement. See generally, id. at 311-20 (permitting, in appropriate instances, past practices of the parties to be used as implied terms of their agreement).

14

Next, the first paragraph and the first sentence of the second paragraph of each standby agreement explains the purpose of the standby agreement:

> In accordance with provisions of the Railway Labor Act, as amended, a notice was served under date of [date differed for each Standby agreement], on practically all rail-roads in the United States, including [the South Carolina Public Railway Commission], by the accredited representative of employees of such railroads who are represented by the United Transportation Union, of a desire to change existing agreements as set forth in an attachment made part of the aforesaid notice.
>
> The management of [the South Carolina Public Railway Commission] has not authorized and will not authorize any of the conference committees selected by the railroads to represent it in the handling of these matters. Therefore, it is hereby agreed [that the national agreement will be adopted by the parties].

(J.A. 28-31). These provisions, contained in every standby agreement (and entirely ignored by the district court in its order), clearly explain that: (1) the Railway Commission was not a party to the national handling; and (2) the Railway Commission did not merely acquiesce to the results of the national handling, but specifically agreed to adopt that particular national agreement. This is additional evidence of the parties' past practice which the district court should have considered in interpreting the terms of the parties' agreement. See Consolidated Rail, 491 U.S. at 311-20.

Finally, the record shows that the Union has admitted the standby agreements were the parties' usual practice. When the Union initiated the process leading up to the 1988 Standby Agreement, the Union's General Chairperson, John W. Coulter, stated in a letter to the Railway Commission that "[t]he standby agreement has always been the norm concerning our seniority, work rules and rates of pay." (J.A. 32). He went on to explain why that was the case:"This agreement is in alignment with South Carolina State Law 54-3-210 which pro-vides for our work rules and rates of pay to be`in force relative to

15

like employees of interstate railroads <u>operating in the same territory</u> with the terminal railroads authorized hereby.'" (J.A. 32) (emphasis added). In other words, instead of merely accepting the national agreement, the parties left open the possibility of agreeing locally to more regional rates and rules.

The district court, relying on <u>United Transp. Union v. Gateway W. Ry.</u>, No. 95-0908-CV-W-1, 1995 WL 842729 (W.D. Mo. Nov. 14, 1995), discounted the Union's admission in this letter by holding that the Railway Commission could not establish past practice with a single letter. However, the district court failed to consider the other evidence of past practice mentioned above, the implied and express terms and meaning of the parties' various local agreements, and the circumstances surrounding the enactment of these agreements. In light of the above, we believe the Railway Commission has an "arguably justifiable" right under the 1973 Agreement not to adopt the 1996 national agreement, because the 1973 Agreement arguably does not automatically incorporate the new national agreement. However, it is ultimately the arbitrator's role to decide that question. We merely hold that the Railway Commission has met its "relatively light burden" of establishing exclusive arbitral jurisdiction, <u>see Consolidated Rail</u>, 491 U.S. at 307, given that the <u>Consolidated Rail</u> test is "deliberately tilted toward finding a dispute minor." <u>Railway Labor Executives</u>, 915 F.2d at 119.

This conclusion may well result in a delay of the bargaining process between the Railway Commission and the Union until the arbitration process has interpreted the 1973 Agreement and the standby agreements. Nevertheless, the Supreme Court has explicitly allowed such a consequence to occur. The <u>Consolidated Rail</u> Court stated:

> The effect of this ruling, of course, will be to delay collective bargaining in some cases until the arbitration process is exhausted. But we see no inconsistency between that result and the policies of the RLA. In most cases where the Board determines that the employer's conduct was not justified by the contract, the Board will be able to fashion an appropriate compensatory remedy which takes account of the delay.

16

<u>Consolidated Rail</u>, 491 U.S. at 310 and n.8. In the meantime, the Railway Commission need not pay the increased wage and health benefits pending resolution of this minor dispute. <u>See id.</u> at 304 (stating that the Supreme Court has never recognized in a minor-dispute situation a statutory obligation on the part of an employer to maintain the alleged <u>status quo</u> pending the arbitration board's decision).**5**

III.

Because we conclude that the present dispute is a"minor dispute" under the RLA, we hold that the district court abused its discretion in issuing the preliminary injunction against the Railway Commission. <u>See McHan</u>, 101 F.3d at 1040; <u>Manning</u>, 119 F.3d at 263. We therefore vacate the preliminary injunction and remand with instructions to dismiss the Union's action for lack of subject-matter jurisdiction. <u>See Railway Labor Executives</u>, 915 F.2d at 119 (stating that if the railroad's assertion rises above the "frivolous or obviously insubstantial," then the court must dismiss the action for lack of subject matter jurisdiction).

<u>VACATED AND REMANDED</u>
_____

**5** Because of our disposition of the case on this issue, we need not reach the other issue the Railway Commission raises in its appeal, namely whether the district court's injunction deprives the Railway Commission of selecting its own bargaining representatives.

17